Joseph LOUGHNEY and Robert J. Osborne, Jr., Plaintiffs,

v.

Eugene F. HICKEY, both Individually and in his capacity as Mayor of the City of Scranton; City of Scranton, Pennsylvania, c/o John Brazil, Esquire, Solicitor of the City of Scranton, Pennsylvania; and Gaynor Cawley, Individually and in his capacity as Director of Public Works of the City of Scranton, Defendants.

Civ. A. No. 78–302.

United States District Court, M. D. Pennsylvania.

Dec. 12, 1979.

John J. Brazil, City Sol., Ralph J. Iori, Jr., Asst. City Sol., Dept. of Law, Scranton, Pa., for defendants.

## MEMORANDUM

HERMAN, District Judge.

## I. PROCEDURAL HISTORY

Plaintiffs initiated this action on March 30, 1978 by filing a complaint alleging that they were discharged from their employment as municipal officers for the city of Scranton for political reasons and seeking reinstatement and back pay. A trial was held before the court without a jury on June 5, 6, and 7, 1979. Trial briefs were filed by Defendants and Plaintiffs on July 20 and 26, 1979 respectively. On October 18, 1979 we ordered counsel for both sides to prepare more detailed findings of fact. Defendants filed their suggested findings of fact on October 26, 1979 and Plaintiffs filed theirs on October 29, 1979. Because we believe that the First Amendment freedom of association as described in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), does not extend to the Plaintiffs in this matter, we find for Defendants and will enter judgment accordingly.

## II. FINDINGS OF FACT

1. Joseph Loughney was an employee of the City of Scranton from 1974 until termination on February 10, 1978.

2. Loughney worked as a foreman in the Department of Public Works from February 1974 to 1977 and as Superintendent of Bureau of Highways from 1977 until February 10, 1978.

3. Robert Osborne was an employee of the City of Scranton from September 1974 until termination on February 10, 1978.

Brian J. Cali, James G. McDonough, Dunmore, Pa., for plaintiffs.

4. Osborne began his employment as a CETA[1] employee, went through a training program in 1974, and in 1975 was hired as Superintendent of Refuse.

5. Both the Bureau of Highways and the Bureau of Refuse are Bureaus within the Department of Public Works.

6. There are six (6) Bureaus within the Department of Public Works.

7. During the years 1974 through 1978 three (3) different Directors of Public Works served the City of Scranton, specifically, James McNulty, Gregory Herbster and Gaynor Cawley.

8. The principle function of the Bureau of Highways is the maintenance and clearing of the city streets.

9. Mr. Loughney's 1978 salary was $13,700.00 and his 1979 salary would have been $14,800.00; he received benefits of approximately $200.00 per month.

10. The job of Superintendent of Refuse was to implement the standing orders of the Director of the Department of Public Works and provide information to the Directors and insure that the Directors' orders were carried out in the field.

11. The primary duty of the Superintendent of Refuse was to collect garbage within the city limits.

12. Osborne was paid $13,700.00 in 1978 and would have been paid $14,800.00 in 1979; he received benefits of approximately $200.00 per month.

13. The election for the Mayor of the City of Scranton in 1977 was hotly contested and there were three (3) candidates, James B. McNulty, Reverend Vernon Searfoss, and Eugene F. Hickey.

14. McNulty ran on a sticker ballot.

15. Loughney and Osborne publicly supported the candidacy of James McNulty by openly soliciting votes for him, erecting political signs, displaying political signs in their homes, and serving as election watchers on election day.

16. Both Osborne and Loughney worked at a televised event, at which 20,000 people were present, and received television credits for their appearance in that program.

17. Loughney and Osborne, on Election Day, November 7, 1977, challenged absentee ballots on behalf of McNulty at the polls, appeared at a public hearing at which Eugene Hickey was present, and testified on behalf of McNulty.

18. Loughney and Osborne watched over election machines impounded during the months of November and December of 1977 on behalf of Mr. McNulty. Present at such watch were members of the Hickey Election Committee.

19. Loughney and Osborne, on behalf of James McNulty, signed an election contest petition which contested the election of Eugene Hickey as Mayor.

20. It was general knowledge throughout the community, especially the political community, that Loughney and Osborne supported the candidacy of James McNulty.

21. Gaynor Cawley, Director of Public Works and the superior of both Plaintiffs, was aware of the fact that Osborne and Loughney supported the candidacy of James Barrett McNulty.

22. Eugene F. Hickey, the Mayor elect, was aware of the fact that both Loughney and Osborne supported the candidacy of James Barrett McNulty.

23. In the course of his door-to-door campaign, Hickey discovered that people were concerned about the methods and efficiency of garbage collection and street repair.

24. On February 5th, 6th and 7th of 1978 a very severe snowstorm hit the Scranton area.

25. On February 6th and 7th of 1978 Raymond Boynton, janitor for the Department of Public Works, remained in the department for 37½ hours, because he was unable to get out as a result of the severity of the snowstorm.

---

1. Comprehensive Employment and Training Act, 29 U.S.C. §§ 801 *et seq.*

26. On February 6, 1978, Loughney did not end his working day until 1:00 a. m. on February 7, 1978.

27. On the morning of February 7, 1978, Mr. Loughney was preparing to go to work at his normal hour, but was snowed in at his residence and was unable to get to work.

28. Loughney resided approximately a mile and one-half from his work site in the City of Scranton and the general nature of the roads between his home and his work site at the Public Works garage is level.

29. On the morning of February 7, 1978, Loughney attempted to walk to work but was unable to do so because of the accumulation of snow.

30. On February 7, 1978, Loughney did not have possession of any four-wheel drive vehicle.

31. At 6:15 a. m. February 7, 1978, Loughney called into work informing his office that because of the snow he was unable to get in and he requested a four-wheel vehicle to pick him up. Later in the morning Loughney again called requesting to be picked up by a four-wheel drive vehicle.

32. Mr. Joseph Loughney as Superintendent of the Bureau of Highways had the duty to set an example to the men concerning work attendance and to motivate the men for work attendance in an emergency.

33. On February 7, 1978, Osborne woke up at 5:00 a. m. preparing to go to work, but was unable to get to work. Osborne lives in the East Mountain Section of the City of Scranton.

34. On February 7, 1978, approximately 60 employees worked for the Department of Refuse; only five reported to work on February 7, 1978.

35. Osborne called his office at the Bureau requesting that a snow plow pick him up and take him into work.

36. On February 7, 1978 all other Bureau heads within the City of Scranton, the Director of the Department of Public Works and some foremen attended work.

37. At or about 1:00 p. m., on February 7, 1978, an emergency four-wheel drive M–A–S–H ambulance vehicle driven by Mr. Fred Schemelfenig arrived at the Loughney residence. Mr. Schemelfenig handed Mr. Loughney a letter signed by Gaynor Cawley, Director of the Department of Public Works, terminating Mr. Loughney from his position as of February 10, 1978. No reason appeared on said letter for his dismissal.

38. At approximately 1:30 p. m., February 7, 1978, a four-wheel drive M–A–S–H ambulance vehicle driven by Mr. Schemelfenig arrived at the home of Mr. Osborne. Mr. Schemelfenig delivered a dismissal letter similar to that received by Mr. Loughney to Mr. Osborne, dismissing him as of February 10, 1978.

39. At no time during their employment were either Loughney or Osborne reprimanded, disciplined, or told that they were not performing in a satisfactory manner.

40. At no time subsequent to their dismissal on February 7, 1978, were either Loughney or Osborne informed of the reason for their dismissal.

41. Loughney and Osborne were both considered to be satisfactory employees by Cawley and Herbster when the latter two were Directors of the Department of Public Works.

42. On the morning of February 7, 1978, Gaynor Cawley made no attempts to contact either Loughney or Osborne by telephone to determine why either man was not at work.

43. Loughney applied for and received unemployment compensation from the Commonwealth of Pennsylvania. The City of Scranton did not contest the claim or allege that he should not be allowed to receive benefits on the grounds that he was removed for cause.

44. In September of 1977 Loughney had been transferred to the Community Development Department where he worked until January of 1978.

45. When Loughney returned to his job as Superintendent of Highways in January

of 1978 he discovered that his job power had been usurped by Eugene O'Hara.

46. Eugene O'Hara was present at the Bureau of Refuse during January of 1978 and issued directives to the men within the Bureau. He did so on a daily basis. At said period of time Eugene O'Hara was not Superintendent of Refuse.

47. A union grievance was filed against Eugene O'Hara in January of 1978 acting in the capacity of Superintendent of Refuse, when in fact, he was not appointed to this position at that time.

48. During the months of November and December of 1977 and prior to the ultimate conclusion of the Election of 1977 Eugene Hickey and Gaynor Cawley met on several occasions to discuss the replacement of individuals in the Department of Public Works and specific reference was made to the Superintendents of Refuse and Highways.

49. Between January 1, 1978 and February 7, 1978, Cawley and Hickey met on several occasions and discussed the replacement of Superintendents of Highways and Refuse.

50. Prior to January 1, 1978, Cawley recommended the names of Fred Schemelfenig and Eugene O'Hara for the positions of Superintendents of Refuse and Highways respectively.

51. Eugene O'Hara and Fred Schemelfenig were appointed to the positions of Superintendents of Highways and Refuse respectively by Eugene Hickey, effective February 10, 1978.

52. There were at least two suggestions made prior to February 7, 1978 that Loughney and Osborne would be dismissed in a short period of time.

53. Mr. Loughney was never told he was being terminated because of his political activity.

54. Director of the Department of Public Works Cawley believed that the positions of Superintendents of Highways and Refuse were filled on the basis of political affiliation.

55. After January 1, 1978, the only two positions in which replacements were made within the Department of Public Works were in the positions of Superintendents of Highways and Refuse.

56. The Home Rule Charter and Administrative Code of the City of Scranton specifically define the duties and obligations of the Director of the Department of Public Works.

57. No job descriptions for the jobs of Superintendent of Refuse or Highways were ever given to either Loughney or Osborne.

58. Mr. Loughney as the Superintendent of Highways reported for work at 6:30 every morning, at which time he would take roll call and report to the Office of the Director of Public Works the number of men present or absent for the day.

59. The Director of Public Works told Mr. Loughney the number of trucks he wanted out and in which areas he wanted work to be done. This procedure was followed on a regular basis.

60. Mr. Loughney as Superintendent of the Bureau of Highways had the power, duty, and authority to make recommendations concerning the priority of jobs to be done by his Bureau.

61. Mr. Loughney as Superintendent of the Bureau of Highways made job assignments to the foremen and the men in the Bureau of Highways by instructing the men where they should work.

62. In addition to getting instruction and orders from the Director, Mr. Loughney as Superintendent followed the same procedure of his predecessors. When a complaint came in to the Department of Public Works it would be written down by clerks and Mr. Loughney would then respond to the complaint.

63. The system of responding to complaints existed when Mr. Loughney assumed the job of Superintendent and he did not alter this system.

64. If the system of complaints were to be altered in any manner, only the Director could do it.

65. Mr. Loughney as Superintendent of the Bureau of Highways had substantial leeway in executing his responsibilities within the Bureau.

66. Mr. Joseph Loughney as Superintendent of the Bureau of Highways could make some decisions on his own concerning the operation of his department.

67. The Director of the Department of Public Works relied upon the recommendations and decisions of the Superintendent of Highways.

68. Loughney did not have the authority to hire or fire employees.

69. The contract between the International Association of Machinists and Aerospace Workers AFL–CIO and the City of Scranton mandates that grievances between union employees and the City are the responsibility of the Director of the Department.

70. It was the responsibility of the Superintendents of Refuse and Highways to inform the Director of the Department of Public Works if problems with an employee existed; the authority to discipline employees rested with the Director.

71. The Director of the Department of Public Works, not the Superintendents of the Bureaus, would determine the vacation time of the employees within the various bureaus.

72. Loughney met with union officials to resolve union grievances about the working conditions of the employees within his Bureau.

73. Loughney did not have the authority to purchase vehicles for his Bureau.

74. The Director of the Department of Public Works, and not the Superintendent of Refuse or Highways, accepted bids for the purchase of equipment.

75. Loughney, as Superintendent of the Bureau of Highways, initiated requisitions for material and equipment within his Bureau.

76. Loughney, as Superintendent of the Bureau of Highways, conferred with the Director of the Department of Public Works on a regular basis concerning the operation of his Bureau.

77. Loughney, in the usual course of business provided information relied upon by the Director of the Department of Public Works in the decision making process.

78. Loughney conferred with the Director of the Department of Public Works and provided information and assistance in the preparation of the budget for the Bureau of Highways and prepared a recommended budget.

79. The Director of the Department of Public Works relied on Loughney as the Superintendent of the Bureau of Highways for the information needed in the preparation of the budget.

80. Loughney, as Superintendent of the Bureau of Highways, identified problems within his Bureau, conferred with the Director of the Department of Public Works, and ultimately made decisions with the Director of the Department of Public Works on the priorities of the Bureau and ways to resolve a problem.

81. Loughney, as Superintendent of the Bureau of Highways, attended and participated in many conferences with the Business Administrator for the City of Scranton.

82. Loughney attended conferences and made recommendations concerning the size of the work force.

83. The schedule of picking up garbage existed before Mr. Osborne became Superintendent of Refuse and was a system which had been handed down from one administration to the next.

84. If the schedule of garbage collection were to be changed, it could only be done by the Director, not by the Superintendent of Refuse.

85. Osborne made changes in the garbage collection routes in the City of Scranton.

86. Osborne as Superintendent of the Bureau of Refuse made certain decisions about the Bureau without prior approval from the Director of the Department of Public Works.

87. Osborne as Superintendent of the Bureau of Refuse suggested and made recommendations concerning his ideas on implementing the garbage collection system.

88. The Director of the Department of Public Works depended on the recommendations and estimates of the Superintendent of Refuse, Mr. Osborne.

89. Osborne, as Superintendent of the Bureau of Refuse, had the power, duty, and authority to analyze problems and conduct meetings to determine the answers to problems within his Bureau.

90. Osborne had no authority to purchase equipment or supplies.

91. Osborne, as Superintendent of the Bureau of Refuse, would confer with and make recommendations to the Director of the Department of Public Works concerning the decision to rent additional refuse trucks.

92. The Director of the Department of Public Works relied on the recommendations of the Superintendent of Refuse, Mr. Robert Osborne, concerning the rental of Packmasters.

93. Osborne recommended the rental of additional Packmaster trucks based on his analysis of the costs of the rental of the vehicles compared to the overtime pay of the employees in his Bureau.

94. Osborne, as Superintendent of the Bureau of Refuse, analyzed refuse landfill sites by making cost studies and made recommendations based on his study and analysis to the Director of the Department of Public Works.

95. As Superintendent of Refuse, Osborne did not have the power to hire or fire employees.

96. The salaries and wages of employees within the Bureau of Refuse were set by the union contract.

97. Overtime pay for employees of the Bureau of Refuse was determined by the Director of the Department of Public Works, not by Osborne.

98. Disciplinary measures and procedures for all employees in the Department of Public Works are established in the union contract, which specifically states that discipline is the Director's responsibility.

99. Osborne had the authority to meet with union officials and resolve union grievances about the working conditions of the employees within his Bureau.

100. Osborne had the power to recommend docking pay from employees for tardiness.

101. The Superintendent of Refuse did not authorize vacations; vacations were the responsibility of the Director of the Department of Public Works.

102. The Superintendent of Refuse did not have the power to alter the schedule of employees or transfer employees from department to department.

103. Osborne, as Superintendent of the Bureau of Refuse, made general communications to the entire work force within his Bureau.

104. Osborne, as a Superintendent, had the ability to recommend certain persons for positions within the bureau, but it was entirely within the discretion of the Director of the Department of Public Works to accept or reject the recommendations of Osborne.

105. On two separate occasions Osborne recommended two individuals for certain positions within the Bureau of Refuse, but the Director, using his discretion, decided not to accept such recommendations.

106. Osborne would provide information and make recommendations to the Director of the Department of Public Works regarding the work schedule.

107. Osborne, as Superintendent of the Bureau of Refuse, had the power and the right to consult and confer with and make recommendations to the Mayor of the City of Scranton.

108. Osborne, as Superintendent of the Bureau of Refuse, made general press releases.

109. Osborne did not submit the budgets for his Bureau to the Mayor of the City of Scranton. He provided budgetary information to the Director on a form given to Mr. Osborne by the Director of the Department of Public Works.

110. Osborne, as Superintendent of the Bureau of Refuse, made recommendations concerning substantial budgetary expenses regarding the purchase of Packmasters for the City of Scranton.

111. The Superintendent of the Bureau of Refuse was responsible for providing a budget analysis for the Director of the Department of Public Works and conferring with the Director about the budget for his Bureau.

## III. DISCUSSION

### A. Facts

Joseph Loughney (hereafter referred to as "Loughney") and Robert T. Osborne (hereafter referred to as "Osborne") were municipal employees for the city of Scranton until they were discharged on February 10, 1978. Loughney had been employed by the city from 1974 to his date of termination and served as Superintendent of the Bureau of Highways for the last part of his tenure. Osborne had been employed from 1975 and had served as Superintendent of the Bureau of Refuse until the end of his employment. Both Bureaus are within the Department of Public Works, and the Director thereof was the immediate supervisor of both Plaintiffs.

The primary function of the Bureau of Refuse is the collection and disposition of the city residents' garbage. The Bureau of Highways' primary responsibility is the maintenance and cleaning of the streets of the city. Although neither Loughney nor Osborne had the power to hire or fire employees or to mete out any final disciplinary sanctions, they were permitted and encouraged to confer with the Director concerning those matters and to make recommendations. Under the union contract, only the Director had ultimate responsibility for those labor matters.

While Plaintiffs were employed as superintendents, the budget for the city of Scranton was prepared by the Mayor for submission to the City Council for final approval. Each Director was required to submit recommended budgets for his department to the Mayor. In the course of the preparation of the budget for the Department of Public Works, the Director sought recommended budgets and budgetary information from the superintendents for each bureau, including Plaintiffs. In reviewing the proposed budgets and information, the Director conferred with the superintendents and discussed the priorities of various budgetary items. The final decision about which budgetary priorities were to be presented to the Mayor rested with the Director.

Each of the Plaintiffs was a field representative of the Director. Each was responsible for carrying out the standing orders in his Bureau and performing the duties requested by the Director. Plaintiffs began each day by taking a roll call of their employees and supplied a list of absentees to the Director. The superintendents met regularly, often on a daily basis, with the Director to discuss all of the matters concerning their respective bureaus. Based on these discussions, the Director established general guidelines for operation of the bureaus. These guidelines were to be implemented and fleshed out by the superintendents.

In the summer and fall of 1977, a mayoral election was conducted in Scranton. One of the candidates was the present may-

or, Defendant Eugene Hickey. Another candidate, James B. McNulty, was running on a sticker-type write-in campaign. It was common knowledge among the city's political community that Plaintiffs actively supported and worked for the McNulty campaign. When McNulty lost and Hickey won, the latter held discussions in late 1977 and early 1978 regarding potential replacements for the positions of Superintendents of Refuse and Highways. These discussions included the Director of the Department of Public Works, Gaynor Cawley, who eventually discharged the Plaintiffs. The testimony at trial clearly indicated that the Plaintiffs' continued employment was in jeopardy from the day that it appeared that Hickey had won the election.

In early February 1978 a heavy snowfall struck the East coast including the Scranton area. On February 6, 1978 a snow emergency was declared in the city. Loughney returned home on the morning of February 7 at 1:00 a. m. He had been at his work the entire preceding day from approximately 6:00 a. m. Osborne began work on February 6 at about the same time and returned home at 8:00 p. m. that evening. On the morning of February 7, 1978, both Plaintiffs awoke and prepared to go to work at the regular times. They were unable to get to City Hall because another snowstorm had struck Scranton during the night. Plaintiffs called their offices and requested that vehicles be sent to their homes to pick them up. Unable to get to work without proper vehicles, the men remained at home waiting to be picked up by city vehicles. Both Plaintiffs had further communications with their offices, renewing their requests for emergency transportation.

The snowstorm crippled the entire East coast and the Scranton area. Many offices and businesses were closed because of it. A very high number of the city of Scranton's employees could not report to work on February 7, 1978 because of the heavy accumulation of snow.

Between 12:00 noon and 2:00 p. m. on the afternoon of February 7, 1978 Fred Schemelfenig arrived at each of the Plaintiffs' homes in a M–A–S–H ambulance loaned to the city by the National Guard. Schemelfenig delivered to each Plaintiff a letter of dismissal effective February 10, 1978. The letter was signed by Cawley and contained no reasons for the dismissal. Cawley testified that he was unaware of the phone calls Plaintiffs made to their offices that morning. Cawley failed to attempt to contact Plaintiffs to find out why they were absent. No investigation was made, no reprimand issued, and no questions were asked of the Plaintiffs. At no time prior to February 7, 1978 had either Loughney or Osborne been reprimanded, disciplined, or otherwise warned about unsatisfactory job performance.

Cawley testified that the reason Loughney and Osborne were discharged was for failure to report to work during a snow emergency. No other employee of the city had been discharged for not reporting to work that day but all other Bureau chiefs did report. When Loughney applied for unemployment compensation, the city did not contest the approval of the application on the basis of discharge for cause.

We agree with Plaintiffs when they suggest to us that we must face two principal issues. First, we must decide whether Plaintiffs were discharged from their positions as municipal employees solely because of their political affiliations and beliefs or whether they were discharged for cause. Second, we must decide whether Loughney and Osborne are protected from political firing by the First Amendment as described by the United States Supreme Court in *Elrod v. Burns, supra,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Because we need not reach the *Elrod* issue if we find that Plaintiffs were discharged for cause, we will address that issue first.

B. *Discharge for Cause or for Political Belief*

The overwhelming impact of the testimony convinces us that Plaintiffs Loughney

and Osborne were discharged from their superintendent positions because of their political affiliations and beliefs. The widespread notoriety caused by their activities for McNulty could not have escaped the Hickey staff. The comments exhibiting surprise that Plaintiffs had continued their employment with the city under the Hickey administration until February 1978 indicate the political atmosphere surrounding their final discharge. *See* T–105, 242, 243, 479, 480 and 491. We simply cannot look at the discussions held between Hickey and Cawley in late 1977 and January 1978 and believe anything other than that Plaintiffs' days were numbered.

■ It may very well be that the severe snowstorm of 1978 and Plaintiffs failure to get to work on February 7, 1978 hastened the ultimate date of discharge. It is apparent to us, however, that the storm merely led to an earlier *time* of discharge and did not lead to the discharge itself. The decision to replace Loughney and Osborne had been made, we are convinced, some time before February 7, 1978. Loughney's powers and authority had already been partially usurped, first by his transfer to the Department of Community Development and later, upon his return to Highways, by a union member who had taken over responsibility for the Bureau. We hold therefore that the decision to discharge Loughney and Osborne from their positions as municipal officials was made sometime prior to February 7, 1978 and was based on their political affiliations, activities, and beliefs.

### C. *Elrod's Protection Against Political Firing*

■ In 1976, the year of the 200th anniversary of our country's political birth, the United States Supreme Court struck a blow at the roots of the political patronage system in the decision of *Elrod v. Burns, supra,* 427 U.S. 347, 96 S.Ct. 2673, 49

L.Ed.2d 547 (1976). Although unable to agree on the precise rationale for the holding, five Justices agreed that patronage dismissals violate the First and Fourteenth Amendments. Dismissal of government employees because of their political affiliations and beliefs is unquestionably a violation of their First Amendment rights to freedom of association. 427 U.S. at 356–57, 96 S.Ct. 2673. The Court recognized, however, that an imposition on government employees' First Amendment rights might be permitted for appropriate reasons.

> In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

427 U.S. at 363, 96 S.Ct. at 2685 (footnote omitted).

■ Although the Court found that patronage firing did further a vital government objective by a least restrictive means, the Court was divided in its holding. The plurality opinion of Justice Brennan[2] limited patronage dismissals to government employees in "policymaking positions". 427 U.S. at 367, 96 S.Ct. 2673. Justice Brennan regarded non-policymaking employees as having only limited responsibility without power to thwart the goals of the in-party.

■ When the Court issues a decision in which a majority of the Justices fail to agree on a single opinion, lower federal courts must interpret it on the basis of the narrowest ground of agreement of a majority of the Justices. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Justice Stewart's concurring opinion in *Elrod*[3] regarded the issue as "whether a nonpolicymaking, nonconfiden-

---

2. Justice Brennan was joined by Justices White and Marshall.

3. Justice Blackmun joined this opinion.

tial government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). Because the concurring opinion added the element of "nonconfidential", most federal courts have regarded it as narrower than the plurality opinion and have followed it as the governing law. *See, e. g., Stegmaier v. Trammell,* 597 F.2d 1027, 1033–34 (5th Cir. 1979) (and cases cited therein); *Alfaro de Quevado v. de Jesus Schuck,* 556 F.2d 591, 592 n.2 (1st Cir. 1977); *Ramey v. Harber,* 431 F.Supp. 657 (W.D.Va.1977), *aff'd in part, rev'd in part,* 589 F.2d 753 (4th Cir. 1978).

The only government interest regarded as sufficiently vital by the Court to permit the denial of First Amendment rights is "the need for political loyalty of employees [so that] representative government [will] not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. 2686. The interpretations of what is covered by that government interest have led to numerous court decisions construing "non-policymaking, nonconfidential government employee". The courts split over whether the test is conjunctive or disjunctive, i. e., whether an employee who is "confidential" *or* "policymaking" is beyond First Amendment protection, or whether the employee must be "confidential" *and* "policymaking".

Although neither party before us chose to refer us to the decision, the Third Circuit approached this question in *Rosenthal v. Rizzo,* 555 F.2d 390 (3d Cir. 1977). The court reviewed a grant of summary judgment in favor of the defendants in a political firing matter and reversed the district court. The court admonished the lower court for making findings of fact between conflicting evidence in a motion for summary judgment. Judge Aldisert dissented from this decision because he believed that the patronage system should be left as unfettered as possible. He argued strongly for the ability of governing individuals to dismiss nonpolicymaking, confidential employees because of their political affiliations. 555 F.2d at 396–97 (Aldisert, J., dissenting). The pleadings indicated, he believed, a clear record of the nature of the plaintiff's employment. Judge Aldisert believed that the plaintiff was unquestionably a confidential employee and was therefore vulnerable to political firing under the disjunctive approach to the *Elrod* test of Justice Stewart.

■ The majority opinion in *Rosenthal* disagreed with the disjunctive interpretation of the Stewart test and construed the test as requiring consideration of *both* conditions:

It is true that Mr. Justice Stewart's concurrence in *Elrod* refers to a "nonpolicy making [sic], nonconfidential government employee". 427 U.S. at 375, 96 S.Ct. at 2690. In our view the additional adjective—nonconfidential—does not change the basic thrust [of] the plurality opinion, which is directed at policy *formulation* and representative government. A "confidential government employee" in this sense would not necessarily be one . . . who has covert activities as part of his duties, but instead one who is privy to the discussions and information involved in the policymaking process.

555 F.2d at 393 n.5 (emphasis in original). It is clear that in the Third Circuit, "one who is privy to the discussions and information involved in the policymaking process" is outside the protection of the First Amendment as described by the Supreme Court in *Elrod.* This definition includes not only the policymaker himself, but extends also to those involved in the *process* of establishing policy.

This rule has been adopted by at least two other courts. In *Finkel v. Branti,* 457 F.Supp. 1284 (S.D.N.Y.1978), *aff'd,* 598 F.2d 609 (2d Cir. 1979) *cert. granted,* —— U.S. ——, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979), the court applied the conjunctive approach to the Stewart test and developed the following definition:

An employee is a "confidential employee" if he or she *stands in a confidential relationship to the policymaking process, e. g., as an advisor to a policymaker,* or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, *e. g.* as a private secretary to a policymaker.

457 F.Supp. at 1291 (emphasis added). The *Finkel* decision's definition was adopted generally by the Fifth Circuit as part of the Stewart test, but the latter court went on to include persons in a confidential position with nonpolicymaking elected officials. *Stegmaier v. Trammell, supra,* 597 F.2d 1027, 1040 (5th Cir. 1979).

We do not need to decide whether the *Aldisert* and *Stegmaier* opinions are correct. It does not matter in our present situation whether confidential, nonpolicymaking employees are subject to political firing. Our only present concern is whether Plaintiffs were municipal employees who were advisers to a policymaker and who constantly participated in and were privy to the discussions and information involved in the policymaking process. That is the type of government employee who is not protected by *Elrod* and who is therefore subject to discharge solely because of his political affiliations and beliefs.

We have no trouble in ruling that Plaintiffs were advisers to the Director of the Department of Public Works. We also are convinced that Plaintiffs participated in and were privy to much confidential information and many discussions with the Director. The facts are admitted by Plaintiffs in their trial brief (pp. 15–17) and are enumerated in our Findings of Fact. It was the duty and responsibility of both Loughney and Osborne to report to the Director, to confer with the Director, to make recommendations to the Director, and to provide information to the Director.

The next question to be faced is whether the discussions, recommendations, and information were part of policymaking. This question has two principal parts. First, is the Director of the Department of Public Works a policymaker. Second, did the discussions, recommendations, and information concern the fundamental policy of municipal government.

Plaintiffs refer us to the Administrative Code of the city of Scranton in their trial brief. Section 311 of the Administrative Code defines the "broad duties and powers" of the Director of Public Works. We need not spell out these duties and powers because we fully agree with Plaintiffs' assessment: "Director's responsibilities by definition in the Code itself surely make him one in a policymaking position." Plaintiff's Trial Brief, p. 14. Thus the first step of the policymaking test is satisfied: Plaintiffs were involved in discussions, recommendations, and conferences with a policymaker. The question remains whether these discussions involved legitimate "policy" determinations for a city government.

The administration of a municipal entity concerns *per force* considerations of topics somewhat more mundane than those faced by the federal government. There is no defense policy, no space policy, and no foreign policy. A state government has a welfare policy, a criminal policy, and an education policy that are also generally beyond the jurisdiction of city government. City government is more concerned with the day-to-day existence and comfort of its populace. A city provides police and fire protection. A city often provides sewer and water services. A city also provides for the maintenance and clearing of its streets and for the collection and disposal of garbage. Potholes and garbage collection are often the bases of successful political campaigns for local government. Both garbage and potholes, the candidates exclaim, will be removed quickly, efficiently, and inexpensively.

The Supreme Court cited, as its basis for *Elrod,* the need of government officials to implement and effectuate policies of a new administration presumably sanctioned by the electorate. We had testimony that one of the issues of the 1977 campaign concerned the Bureaus of Highway and Refuse. People were dissatisfied with tardy collec-

tion of garbage and failure to repair the streets. The Director whose ultimate responsibility is to rectify such maladies is unquestionably making policy decisions crucial to the fulfillment of campaign issues and promises. Municipal employees who have the power, duty, and authority to report to the Director concerning implementation of the program, to recommend to the Director more efficient, less costly methods of implementation, and to provide budget information that would eventually be reflected in increased or decreased service are advisers to a policymaker and are an integral part of the policymaking process.

We hold therefore that Loughney and Osborne, as Superintendents of Highways and Refuse respectively, were advisers to the Director and privy to discussions in which policy of the utmost importance to the effective administration of a municipal government was established. This does not mean that every employee of a governmental body who has a suggestion or recommendation for implementing policy is subject to political discharge. Nor does it mean that any employee who has the authority to approach a Director or policymaker with suggestions and recommendations loses his or her *Elrod* protection. We deal only with managerial, supervisory personnel that have the actual *duty* to take part in day-to-day discussions concerning the establishment and implementation of policy. It is only these municipal employees who are part of the policymaking process and lose their *Elrod* protection under this decision.

On the basis of the preceding discussion, we believe that the discharge of Plaintiffs, motivated as it was on their political beliefs and affiliations, did not constitute an impermissible infringement of their constitutional rights. The city government officials had a valid and vital government interest that was furthered by removing the political dissidents from their positions of influence in the policymaking decisions of the city government.

## IV. CONCLUSIONS OF LAW

1. Plaintiffs, Joseph Loughney and Robert T. Osborne, were discharged from their employment by a municipal government solely on the basis of their political beliefs, affiliations and activities.

2. City government officials have a vital interest in maintaining political loyalty of city employees so that representative government will not be undercut by tactics obstructing the implementation of policies of the new administration presumably sanctioned by the electorate.

3. A nonpolicymaking, nonconfidential government employee cannot be discharged or threatened with discharge from a job upon the sole ground of his or her political beliefs, affiliations, and activities.

4. A policymaking, confidential government employee is one who takes active part in policymaking and who is privy to the discussions and information involved in the policymaking process.

5. Plaintiffs, Joseph Loughney and Robert T. Osborne, were policymaking confidential government employees and were therefore subject to discharge solely on the basis of political beliefs, affiliation, and activities.