635 F.2d 1063
 LOUGHNEY, Joseph and Osborne, Jr., Robert J., Appellants,
v.
HICKEY, Eugene F., Individually and in his capacity as Mayor
of the City of Scranton; City of Scranton, Pennsylvania c/o
John Brazil, Esquire, Solicitor of the City of Scranton,
Pennsylvania; and Cawley, Gaynor, Individually and in his
capacity as Director of Public Works of the City of Scranton.
 No. 80-1158.
 United States Court of Appeals,
Third Circuit.
 Submitted under Third Circuit Rule 12(6) Oct. 9, 1980.
Decided Nov. 7, 1980.
 
 Appeal from United States District Court for the Middle District of Pennsylvania; R. Dixon Herman, Judge.
 James G. McDonough, II, Carbondale, Pa., Brian J. Cali, Dunmore, Pa., for appellants.
 John J. Brazil, and Ralph J. Iori, Jr., Mazzoni, Popeck, Iori, Mazzoni & Rinaldi, Scranton, Pa., for appellees.
 Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM:
 
 
 1
 This appeal from a judgment of the district court entered December 12, 1979, following a decision in a non-jury trial that turned on the court's interpretation of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), presents the question of whether the proceedings should be remanded for reconsideration in light of the subsequent decision in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Inasmuch as Branti established a new test for determining whether a discharge of a public employee for political reasons violates the first amendment, we will vacate the judgment and remand to the district court for reconsideration in light of that decision.
 
 
 2
 In Elrod the Court held that the newly-elected Democratic sheriff of Cook County, Illinois, had violated the constitutional rights of certain non-civil service employees by discharging them "because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders." 427 U.S. at 351, 96 S.Ct. at 2678. That holding was not supplied by an opinion of the court, but by the separate opinions of Justices Brennan and Stewart. Justice Brennan's plurality opinion concluded that the first amendment protects a public employee from discharge for what he has said or believes with respect to a political contest. Justice Stewart anchored his concurrence on the same amendment but suggested that only "nonpolicymaking, nonconfidential" employees were protected from political discharge. 427 U.S. at 375, 96 S.Ct. at 2690.
 
 
 3
 Subsequently, in Rosenthal v. Rizzo, 555 F.2d 390 (3d Cir. 1977), we construed Elrod to require consideration of both parts of Justice Stewart's test:
 
 
 4
 It is true that Mr. Justice Stewart's concurrence in Elrod refers to a "nonpolicymaking, nonconfidential government employee." 427 U.S. at 375, 96 S.Ct. at 2690. In our view the additional adjective-nonconfidential-does not change the basic thrust (of) the plurality opinion, which is directed at policy formulation and representative government. A "confidential government employee" in this sense would not necessarily be one ... who has covert activities as part of his duties, but instead one who is privy to the discussions and information involved in the policymaking process.
 
 
 5
 555 F.2d at 393 n.5 (emphasis in original).
 
 
 6
 It was against the background of Elrod and Rosenthal that the district court considered the claim of improper discharge from public office brought by two employees of the City of Scranton, Pennsylvania: Loughney, Superintendent of Public Highways; and Osborne, Superintendent of the Bureau of Refuse. Both positions were under the immediate supervision of the Director of the Department of Public Works. The district court found that Loughney and Osborne were discharged from their positions because of their political affiliations and beliefs. Loughney v. Hickey, 480 F.Supp. 1352, 1360-61 (M.D.Pa.1979). Nevertheless, it denied a claim for relief brought under 42 U.S.C. § 1983. The court was of the view that the plaintiffs participated in the policymaking decisions of the city government and consequently were not protected from political discharge. 480 F.Supp. at 1364.
 
 
 7
 Were it not for the intervention of the Branti case some four months after the district court's decision, we would have been inclined to affirm. But Branti established a new test: "(T)he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294. It is against the teachings of Branti v. Finkel that the district court must now reconsider this case.
 
 
 8
 The judgment of the district court will be vacated and the proceedings remanded in accordance with the foregoing.
 
 
 9
 Each side to pay its own costs.
 
 
 10
 ALDISERT, Circuit Judge, concurring.
 
 
 11
 I concur in the result reached by this court because the essence of the common law tradition, unlike the civil law, is that lower courts follow the decisions of higher courts in the same judicial hierarchy.[1] But this concurrence is what the gifted scholar B. E. Witkin described as a "reluctant concurrence" or a "concurrence under compulsion."[2] I agree with the judgment because my loyalty to the doctrine of stare decisis commands that I follow the decisions of the Supreme Court of the United States.
 
 
 12
 Institutional loyalty, however, cannot, and should not, dissuade me from registering this statement of vehement disagreement with the result and the reasoning in both Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the progenitor, and its offspring, the "Son of Elrod," Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In my view, these cases were incorrectly decided. They reflect the apogee of a process that seeks to "constitutionalize" the entire fabric of American society. This process transmutes the United States Constitution from a broad statement of moral values into a detailed code of conduct, ignoring Chief Justice Marshall's admonition that "we must never forget, that it is a constitution we are expounding." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819) (emphasis in original). Forgetting this precept, the Court threatens to bond the Constitution's timeless principles to its own fleeting views of desirable behavior.[3]
 
 I.
 
 13
 Democratic government requires that decisions of elected public officials be implemented to the fullest extent; only in this manner may a true record be placed before the electorate for commendation or deprecation. This principle lies at the heart of political government embodied in Articles I and II and the ninth, tenth, and fourteenth amendments of the Constitution.
 
 
 14
 Prior to the advent of civil service, the local, state, and federal administrations reflected both the policy and the implementation of the elected officials. Officials used their appointment powers to select policy makers of similar views, and to discipline subordinates to insure that the policies mandated by the electorate were carried out. The theory was that government should be responsive to officials who are accountable to the electorate.
 
 
 15
 The purely political system begat corruption, however, and reforms were necessary. Legislative creation of civil service employment classifications was one response. In addition, public opinion persuaded some political leaders to practice self-restraint. Now the Supreme Court has made that popular movement a constitutional command.
 
 
 16
 One very important question not yet seriously investigated is whether an independent civil service, an unbridled bureaucracy, was too great a price to pay for the elimination of an undetermined amount of public corruption. The intent of civil service was to clean up government, and in Theodore Roosevelt's phrase, "to raise the tone of public life." At the risk of inveighing against motherhood and apple pie, I advance the thesis that the reform zeal that caused the replacement of patronage with an all-pervasive civil service has given us little improvement and much cause for concern.[4] From the standpoint of efficient democratic government, the result of replacing patronage with civil service, in my view, has been disastrous.[5]
 
 
 17
 Governmental bureaucracies have a double layer of protection that deprives an elected official of the power to get government employees to do their jobs. One layer is the virtual impossibility of firing even the most incompetent or intransigent civil servants because of complex, expensive, and time-consuming termination procedures. A second layer is the protection provided by the civil service unions, which have so much power over cities, counties, states, and the federal government "that in the final analysis the bureaucracies are in a position to dictate to elected officials and their appointees."[6] Discussing Elrod, one commentator has written, "(w)hat the Court forgets is that, if government is to work, policy implementation is just as important as policymaking. No matter how wise the chief, he has to have the right Indians to transform his ideas into action, to get the job done.[7] This important fact of modern governmental life was not even considered in the Supreme Court's balancing process.
 
 
 18
 No law review article or political science treatise adequately responds to the uniform views of beleaguered mayors, county executives, governors, and federal cabinet officers concerning the difficulties of producing a government responsible to an electorate, but dependent for its implementation on the headless fourth branch of government. These leaders now have the responsibility, but not the authority, to govern. Two familiar examples will suffice. In modern police departments, very few mayors have appointment or promotion power for positions below the rank of inspector; yet the mayors are held responsible for the conduct of the department. The power of governors to order personally even the most mundane of government services, like salting a state road on a cold, icy night, is more ephemeral than real; yet in the heyday of political machines, roads were made passable in winter. Such is the product of the all-pervasive progress of civil service reform.[8]
 
 
 19
 Political scientist and author David Flitner, Jr., has emphasized the imperative that a democracy must seek the system that best insures that the public will is carried out. Although he admits its shortcomings, Flitner has observed that the patronage system offers this kind of responsiveness and advocates its restoration:
 
 
 20
 A modified spoils system, in which job retention and good standing in one's party are made dependent upon accountability to the President who gave one the job in the first place, would put more of the right incentives in the public servant's mind (if not heart). There would inevitably be occasional payoffs and kickback scandals under this system and the public would be required to weigh carefully the character of the man they choose as President as well as of those around him. But we would markedly improve the odds that when presidential orders are given, or when legislation is passed, they will be put into effect.[9]
 
 
 21
 Flitner's proposals for national government are equally applicable to local and state governments. The decisions of Elrod and Branti, however, preclude their adoption.
 
 
 22
 Until Elrod a limited number of positions in government remained unanointed with the chrism of life tenure. A significant number of appointments had escaped encapsulation by civil service despite the urging by "reform" groups. The reach of civil service "merit" systems remained the province of the legislative branch. But with Elrod in 1976, civil service reform by judicial fiat picked up where the legislatures had left off. On the two-hundredth anniversary of the founding of American political democracy this centerpiece was designed to take politics out of politics. With all deference, respect, and charity, I submit that the Elrod decision was based on some rather florid notions of the intent and purpose of the first amendment.[10]
 
 II.
 
 23
 The thesis of Justice Brennan's analysis, and the lynchpin of both Elrod and Branti, is that "(t)he cost of the practice of patronage is the restraint it places on freedoms of belief and association." Elrod v. Burns, 427 U.S. at 355, 96 S.Ct. at 2680. I find an uncharacteristic naivete in this statement. To me it would seem to be as self evident as the statement that the cost of returning a kickoff against the Pittsburgh Steelers is the risk of being tackled.
 
 
 24
 From the major premise, Justice Brennan moves to this conclusion:In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions. Finally, patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics since political parties are nurtured by other, less intrusive and equally effective methods. More fundamentally, however, any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms.
 
 
 25
 Id. at 372-73, 96 S.Ct. at 2689.
 
 
 26
 I find no factual component in this conclusory language. There is no reasoned elaboration of "the least restrictive means,"[11] no specific identification of "other, less intrusive and equally effective means" by which political parties may be nurtured. Nor do I perceive the alleged "balance" that was used in the process. I have the gnawing fear that the alleged balancing here emerged as an answer instead of a process, and am prompted to raise Professor Henkin's questions:
 
 
 27
 But what are the weights to be placed in the balance, and how much does each weigh? What is the character of the balance itself, and is a simple overbalance conclusive? How much deference do judicial balances owe to the political bodies which-in theory, at least-balanced previously?[12]
 
 
 28
 In all cases of institutional or precedential consequence, the courts have a duty of reasoned elaboration. This duty requires "that reasons cannot be merely ritualistic formulae or diversionary sleight of hand."[13] The Court has violated this duty in Elrod and Branti. It has not reached its decisions responsibly; it has done it with mirrors. The Court has not employed a reasoned discourse that balances recognized first amendment concerns against practical considerations of government.[14]
 
 
 29
 "People do take judicial reasoning seriously," Professor Charles A. Miller has observed, "and they are not fools nor being fooled in doing so, at least no more than in other forms of communication or with respect to other strands that form the web of a political culture."[15] Legal reasoning cannot be artificial, esoteric, or understandable only to an elite legal priesthood; it must be capable of public comprehension.
 
 
 30
 I suggest that the various majority opinions in both Elrod and Branti are not capable of public comprehension. They seem to stand for the proposition that self-government means a government by philosopher kings, who by the mystical incantations of a Druidic ritual set forth a standard of conduct for society. Their prototype of society is not a society of real people-with passions, prejudices, biases, emotions, superstitions, and deep feelings-but an Alice in Wonderland society of plastic people where government positions are awarded only on the basis of "merit," whatever that means, and where there should never be political considerations "for the benefit of one political party simply because that party has control of the government."[16] The real world does not recognize the elegant but meaningless glossolalia of "least restrictive means" and "less intrusive and equally effective methods." The real world expects from its judges more than "the sweeping dogmatic statement, of the formulation of results accompanied by little or no effort to support them in reason, in sum, of opinions that do not opine ...."[17] People in the real world expect rewards when their party wins and ashes if it loses. They have played the political game under these rules at least since the birth of political parties. More to the point, the real world expects that the leaders it elects will appoint people to office to carry out campaign promises and will remove those who do not. These people must be incredulous when confronted with Elrod and Branti.
 
 III.
 
 31
 The lack of cogent reasoning in Elrod and Branti is a symptom of a deeper problem in those opinions. In my view, their results were reached because of the personal moral beliefs of the members of the Court. Although I recognize that it is appropriate for a court to make decisions in light of the moral values of the age, the use of personal moral judgments to destroy a 200 year old political tradition is jurisprudentially offensive.
 
 
 32
 Admittedly, the Court had puissance to do this; but I question its authority. Herbert Wechsler reminded us that a court is "bound to function otherwise than as a naked power organ," and for decisions to have any legal quality, their determinations must be "entirely principled."[18] Any court must always distinguish between the cultivated personal tastes of its members and generally accepted concepts of moral obligation. In discussing the "common morality of society," Dean Rostow reminds us that "in the life of the law, especially in a common law country, the customs, the common views, and the habitual patterns of the people's behavior properly count for much ...."[19] In his perception of conventional morality, H.L.A. Hart distinguishes between standards of conduct that are widely shared in a particular society and moral principles or ideals "which may govern an individual's life, but which he does not share with any considerable numbers of those with whom he lives.[20] I do not believe that the Court paid sufficient respect to either of these salutary considerations.
 
 
 33
 Under the aegis of the first amendment, the Court has used a genre of natural law philosophy: what reason of some sort defines to be good must be done. The Lochner[21] Court, under the now-discredited notion of substantive due process, engaged in this process. The Elrod Court has achieved a similar result. The Elrod and Branti decisions vaunt intuitive moral values but by absolutizing these values the Court has twisted the first amendment into an instrument that ruptures the political base of state government. What has been ruptured is not so much the notion of federalism as the basic fabric of a political democracy-effective self-government.
 
 
 34
 I am willing to elevate to an exalted status the naked text of the first amendment: "Congress shall make no law ... abridging the freedom of speech, or of the press." I am willing to describe it as the most majestic of several constitutional guarantees. I am unwilling, however, to allow it to be used as a slogan, the invocation of which excludes consideration of basic accoutrements of a political democracy or other specific or implicit constitutional provisions. Rules regulating a political order may not eviscerate the order itself.
 
 
 35
 I take as a priori principles of our constitutional republic that we are a political democracy, that we are governed by representatives who come to their office not by the virgin birth but by the political process, and that politics is the science and art of political government. I take it as a further given that a destruction of politics will eventually lead to a destruction of political government. Similarly, I subscribe to the belief that the propositions of the first amendment have never been considered as absolute dogma to the exclusion of other fundamental values and specific constitutional protections, and that in adding a gloss to the naked constitutional text the courts have employed a balancing approach. To be weighed in the balance are the extent to which communication is in fact inhibited and the values, interests, or rights served by enforcing the inhibition. My view of the balance, at variance with that of a majority of the Supreme Court, is that the destruction of important political traditions and practices essential to successful self-government is too great a price to pay for the sole purpose of protecting unbridled freedom of association as an end in itself.
 
 
 36
 What Cardozo said was the essence of every judicial function has special relevance to constitutional adjudication:
 
 
 37
 In problems such as these, the need is fairly obvious for a balancing of social interests and a choice proportioned to the value.... Involved at every turn is the equilibration of social interests ....
 
 
 38
 Back of the answers is a measurement of interests, a balancing of values, and appeal to the experience and sentiments and moral and economic judgments of the community .... Constant and inevitable, even when half concealed, is the relation between the legality of the act and its value to society. We are balancing and compromising and adjusting every moment that we judge.[22]
 
 
 39
 I cannot agree with decisions-such as Elrod and Branti-that fail to engage in this real-life balancing process and instead invoke abstraction to resolve an inherently complex dispute.
 
 IV.
 
 40
 There is simply no realistic answer, in my view, to the dissenting opinions of Justice Powell in Elrod, 427 U.S. at 376-89, 96 S.Ct. at 2691-2697, and in Branti, 445 U.S. at 521-532, 100 S.Ct. at 1296-1302. He has cogently observed that patronage in employment played a significant role in DEMOCRATIZING AMERICAN POLITICS,[23] THAt patronage apPOintments help to molD stable political parties, that political parties serve a variety of substantial governmental interests, and that strong political parties aid effective government after election campaigns end. Obviously perceptive to the facts of modern political life, Justice Powell has noted:
 
 
 41
 Particularly in a time of growing reliance upon expensive television advertisements, a candidate who is neither independently wealthy nor capable of attracting substantial contributions must rely upon party workers to bring his message to the voters. In contests for less visible offices, a candidate may have no efficient method of appealing to the voters unless he enlists the efforts of persons who seek reward through the patronage system.
 
 
 42
 445 U.S. at 528, 100 S.Ct. at 1300 (footnotes omitted). I share with Justice Powell the view that there is a need to preserve the patronage system at all levels of government. This need does not vanish simply because preserving patronage imposes some restrictions on public servants' freedom of association.
 
 
 43
 When I say there is no realistic answer to Justice Powell, I do not say that no answer was forthcoming. Obviously a scholarly argument has been advanced in the majority opinions in Elrod and Branti. But without denigrating by one iota my respect and admiration for the sensitivity, the scholarship, the profound abilities, and the devotion of these great American jurists to the text and spirit of the Constitution, I have the abiding fear that they have viewed the problems presented here from the isolation and quiet of the philosopher's study, rather than a perspective of the world outside. The smell of the lamp permeates their first amendment discussion, but its smoke seems more to smudge than its light to illuminate.
 
 
 44
 The first amendment is regarded properly as a shield protecting fundamental rights of individuals against government excess or tyranny of the majority. It is quite another thing to use it as a sword to cut out the heart of the basic processes that form our tradition of self-government. In my view, that is exactly what the Supreme Court has done here.
 
 
 45
 It is to be hoped that we of the inferior courts, with all fealty to the doctrine of stare decisis, will not extend these decisions beyond their precise holdings; it is further to be hoped that Justice Powell's views will find wider acceptance by his colleagues in the future. Although we must remand these proceedings for reconsideration in light of Branti, I am persuaded that the district court can, with fealty and respectability, reach the same result it did when the facts were measured only against the teachings of Elrod.
 
 
 
 [1]
 See Aldisert, The Nature of the Judicial Process: Revisited, 49 U.Cin.L.Rev. 1, 15 (1980). See also H. Black, The Law of Judicial Precedent 10-11 (1912)
 
 
 [2]
 B. Witkin, Manual on Appellate Court Opinions 223 (1977)
 
 
 [3]
 "(A) constitution is framed for ages to come, and is designed to approach immortality as nearly as human institutions can approach it." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 387, 5 L.Ed. 257 (1821) (Marshall, C. J.)
 
 
 [4]
 I agree with Edward N. Costikyan, a thoughtful New York lawyer, author, and political figure:
 We will never know whether their (civil service reforms) success represents, on balance, progress or retrogression, for all the histories of the political machines and their workings have been written from a reform orientation. It should be observed, however, in the absence of fairer contemporaneous data, that the political machines built the cities, paved their streets, dug their sewers, and piped their water supply systems. Furthermore, under the administration of the machines, mass transit systems, school systems, and massive developments of new housing were constructed.
 It would be laughable to suggest that any of our present city administrations could accomplish one-tenth of what the political machines accomplished during the period from the Civil War to World War I.
 Costikyan, Cities Can Work, Saturday Review, Apr. 4, 1970, at 20.
 
 
 [5]
 For frustrations at the highest level of government, see H. Kissinger, The White House Years (1979), in which Kissinger complains that the State Department "bureaucracy" refused to implement decisions made in the Oval Office. Similarly, John F. Kennedy was often quoted as saying that his biggest disappointment as President was the blighted hope and nonfulfillment of expectations because of the civil service bureaucracy's refusal to transform promise into deed
 
 
 [6]
 Costikyan, supra note 4, at 20. Will Sparks, former aide to President Lyndon B. Johnson, has said:
 For good or ill, the senior civil servant is like a great granite rock deposited in the middle of a lake carved by some long-vanished glacier. He never makes waves, but watches with cool detachment as each new administration comes pouring in like a mountain stream during the spring thaw, swirls about for a time, muddying the waters, and then trickles quietly down to the sea of oblivion.
 Quoted in Flitner, Bring Back the Spoils System to Make Government Work, Boston Globe, October 15, 1980, at 17, col. 1.
 
 
 [7]
 Peters, A Kind Word for the Spoils System, Washington Monthly, Sept. 1976, at 30
 
 
 [8]
 My favorite example of a fact of life after civil service is the United States Postal Service. Prior to the widely heralded reform movement, postmasters and superintendents of substations were unabashed patronage positions of United States Congressmen. This "highly political" system offered twice daily residential and business mail deliveries, a modicum of civility extended to postal patrons at post office windows, and relatively prompt deliveries. This is to be contrasted with the current version, the paradigm of a government operation cleansed of any taint of political responsibility. It is a government model that is 100 per cent antiseptic and entirely inefficient
 
 
 [9]
 Flitner, supra note 6, at 17
 
 
 [10]
 History does not support the Elrod-Branti thesis that patronage dismissals transgress the first amendment. Justice Powell's dissent in Elrod traces the history of patronage appointment and dismissal to the early days of the republic, observing that Washington, Jefferson, and Jackson exercised their patronage powers vigorously. Elrod, 427 U.S. at 377-78, 96 S.Ct. at 2691 (Powell, J., dissenting). Abraham Lincoln, in an effort to strengthen the newly formed Republican party, used effectively his appointment and removal powers
 As Justice Powell observed, patronage appointments and discharges were an almost constant practice in American national politics. They became conspicuously present during the Jacksonian period because of their necessary dormancy during the long succession of Republican presidents. Id. During that period, however, patronage was practiced widely in the states, especially in New York, under the leadership of Martin Van Buren, and in Pennsylvania. The activity on the state level provided the popular legitimacy for Jacksonian democracy on a national level. Id. (citing C. Fish, The Civil Service and the Patronage (1905); D. Rosenbloom, Federal Service and the Constitution (1971)). Ironically, the Supreme Court has now told us that the practices of Washington, Jefferson, Jackson, and Lincoln offended the first amendment. This irony prompted Justice Powell to comment in Elrod that "(w)e should have heeded, instead, the admonition of Mr. Justice Holmes that '(i)f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it ....' Jackman v. Rosenbaum Co., 260 U.S. 22, 31 (43 S.Ct. 9, 67 L.Ed. 107) (1922)." 427 U.S. at 389, 96 S.Ct. at 2697 (citation omitted).
 
 
 [11]
 I note Justice Blackmun's uneasiness with the "least restrictive" test:
 I add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what seems to be a continuing tendency in this Court to use as tests such easy phrases as "compelling (state) interest" and "least drastic (or restrictive) means." ... (F)or me, "least drastic means" is a slippery slope and also the signal of the result the Court has chosen to reach. A judge would be unimaginative indeed if he could not come up with something a little less "drastic" or a little less "restrictive" in almost any situation, and thereby enable himself to vote to strike legislation down. This is reminiscent of the Court's indulgence, a few decades ago, in substantive due process in the economic area as a means of nullification.
 Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992-993, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring).
 
 
 [12]
 Henkin, Infallibility Under Law; Constitutional Balancing, 78 Colum.L.Rev. 1022, 1048 (1978)
 
 
 [13]
 Stone, Man and Machine in the Search for Justice, 16 Stan.L.Rev. 515, 537 (1964)
 
 
 [14]
 Julius Stone has identified three essential contributions of a reasoned elaboration of a decision:
 First, implied in the need for reasoned elaboration is acceptance of the duty to seek a rule which seems, not only to the instant judge, but to appellate courts and lawyers generally, if not right, then as right as possible. The duty of elaboration indicates that reasons cannot be merely ritualistic formulae or diversionary sleight of hand. Second, this duty of the judge reminds him that numerous generations of his predecessors have also performed the same duty and that the experience and learning of his predecessors may bear on his present choices. It thus provides a regular method by which such past experience and learning are marshalled to present problems. Third, the pressure on the judge for reasoned explanation of why he finds the law to be as he does is a control of caprice, haste, and carelessness. The need to justify promotes justifiability.
 Id.
 
 
 [15]
 C. Miller, The Supreme Court and the Uses of History 12 (1969)
 
 
 [16]
 Branti, 445 U.S. at 517 n.12, 100 S.Ct. at 1294. Perhaps the most unreal posture of the Court is its approval of the following: "By what rationale can it even be suggested that it is legitimate to consider, in the selection process, the politics of one who is to represent indigent defendants accused of crime?" 445 U.S. at 520 n.14, 100 S.Ct. at 1295 (quoting Finkel v. Branti, 457 F.Supp. 1284, 1293 n.13 (S.D.N.Y.1978)). I have a quick rationale to offer in response: every prosecutor's office in the nation-state or federal-is a political office. It does not seem strange to expect that the prosecutor's alter ego, the public defender's office, should be the same
 
 
 [17]
 Bickel & Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 Harv.L.Rev. 1, 3 (1957)
 
 
 [18]
 H. Wechsler, Principles, Politics and Constitutional Law 27 (1961)
 
 
 [19]
 Rostow, The Enforcement of Morals, 1960 Camb.L.J. 174, 197
 
 
 [20]
 H.L.A. Hart, The Concept of Law 165 (1961)
 
 
 [21]
 Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed.2d 937 (1905)
 
 
 [22]
 B. Cardozo, The Paradoxes of Legal Science 72-74 (1928)
 
 
 [23]
 427 U.S. at 379, 96 S.Ct. at 2692 (citing C. Fish, The Civil Service and the Patronage 156-57 (1905); Sorauf, Patronage and Party, 3 Midwest J.Pol.Sci. 115-16 (1959))