555 F.2d 390
 Harold ROSENTHAL, Appellant,
v.
Frank L. RIZZO, Individually, and in his official capacity,
Phillip Carroll, Individually, and in his official capacity,
Augustine Salvitti, Individually, and in his official
capacity, and the Redevelopment Authority of Philadelphia, Appellees.
 No. 76-2082.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6) March 29, 1977.
Decided May 25, 1977.
 
 Michael H. Cox, Philadelphia, Pa., for appellant.
 Spencer M. Wertheimer, Philadelphia, Pa., for appellees Redevelopment Authority of Philadelphia and Augustine Salvitti.
 Howland W. Abramson, James M. Penny, Jr., Sheldon L. Albert, Philadelphia, Pa., for appellees Frank L. Rizzo and Phillip Carroll.
 Submitted Under Third Circuit Rule 12(6) on March 29, 1977.
 Before SEITZ, Chief Judge, and ALDISERT and HUNTER, Circuit Judges.
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 This appeal presents claims of employee discharge in violation of the First and Fourteenth Amendments. The District Court for the Eastern District of Pennsylvania entered summary judgment against the employee, Harold Rosenthal. We find no error in the disposition of the Fourteenth Amendment claim.[1] We reverse and remand, however, as to the First Amendment claim for the following reasons.
 
 
 2
 Harold Rosenthal was appointed to a $14,257-a-year position as an Administrative Assistant II in the Commercial and Industrial Relocation Department of the Redevelopment Authority of Philadelphia on October 24, 1972. When Augustine Salvitti took over as the Authority's Executive Director in January, 1974, he fired Rosenthal without a prior hearing. On January 29, 1975, Rosenthal filed an action in the Eastern District of Pennsylvania against the Authority, Salvitti, Frank Rizzo (the Mayor of Philadelphia), and Phillip Carroll (the Deputy Director of Philadelphia). Rosenthal based his action on 42 U.S.C. § 1983 and pendent state claims. His primary allegations were (1) that his discharge without a hearing violated his right to due process under the Fourteenth Amendment, and (2) that he had been discharged because of his political affiliation, in violation of his First Amendment rights of political association. He set forth factual allegations in support of both claims. On April 30, 1976, the district court granted summary judgment against Rosenthal as to all defendants, and he appealed.
 
 
 3
 Rosenthal's Fourteenth Amendment claim was that he had an "objective expectancy of continued employment" and could be dismissed only for "cause." Under Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976), "the sufficiency of the claim of entitlement must be decided by reference to state law." The court below properly ruled against Rosenthal, because under Pennsylvania law, public employees have no contractual entitlement to dismissals only for cause unless the legislature has expressly provided tenure for a given class of employees. Mahoney v. Philadelphia Housing Authority, 13 Pa.Cmwlth. 243, 320 A.2d 459 (1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975). Since the legislature had not provided for tenure in Rosenthal's job classification, he had no right to a "cause" hearing before discharge.
 
 
 4
 Rosenthal's First Amendment claim, however, was more substantial. In general, a state may not condition hiring or discharge of an employee in a way which infringes his right of political association. E. g., Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Elrod v. Burns, 427 U.S. 347, 6 S.Ct. 2673, 49 L.Ed.2d 547 (1976). An exception to this First Amendment protection exists in the case of state employees who formulate policy. This exception is designed to insure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." Elrod, supra, at 367, 96 S.Ct. 2687.
 
 
 5
 For Rosenthal to obtain relief on his First Amendment claim, then, he had to show that he was a non-policymaking employee. Paragraph 10 of his complaint, Appendix at 6a, alleged that his "was a 'non-policy-making' position." In their answer, Appendix at 13a, defendants Salvitti and the Redevelopment Authority admitted the truth of that allegation.[2]
 
 
 6
 Defendants Rizzo and Carroll never filed an answer; however, in their motion for summary judgment, they did contest Rosenthal's allegation that he did not formulate policy. Evidence as to the nature of Rosenthal's duties, in the form of depositions, was imprecise and cut both ways. On the one hand, there was testimony that Rosenthal was merely a "soldier," Appendix at 72a; that he merely oversaw bidding practices to uncover corruption and to make sure policies implemented by others were carried out, Appendix at 113a; indeed, defendant Salvitti himself declared that Rosenthal's primary duty was to act as a spy for the former Director of the Authority, Appendix at 94a; that he had no power to decide which bids for relocation work would be accepted, Appendix at 115a; that he merely worked for the actual policymaker in his department, Appendix at 117a. On the other hand, there was testimony to the effect that he helped rewrite the relocation code, Appendix at 51a; that Rosenthal was a "top line" employee, Appendix at 7a; that he oversaw work and reviewed bids, 99a.
 
 
 7
 Thus, two of the defendants admitted Rosenthal's status as a non-policymaker, while as to the other two defendants, Rosenthal's status represented a genuine issue of material fact. Nevertheless, the district court took it upon itself to weigh the conflicting evidence and resolve the issue against Rosenthal on a motion for summary judgment.[3] This was error. Under Fed.R.Civ.P. 56(c), a district court can grant summary judgment only when "there is no genuine issue as to any material fact . . . ." Professors Wright and Miller have explained that requirement:[4]
 
 
 8
 A motion for summary judgment lies only when there is no genuine issue of material fact; summary judgment is not a substitute for the trial of fact issues. Accordingly, the court cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried. Given this function, the district court examines the affidavits or other evidence introduced on a Rule 56 motion simply to determine whether a triable issue exists rather than for the purpose of resolving that issue. Similarly, although the summary judgment procedure is well adapted to exposing sham claims and false defenses, it cannot be used to deprive a litigant of a full trial of genuine fact issues.
 
 
 9
 Accord, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).[5] While the court below might have been inclined, as is the dissent, to resolve the evidentiary conflict in defendants' favor and conclude that Rosenthal had no duties apart from ones involving policy formulation, "a motion for summary judgment should not be granted on the ground that if a verdict were rendered for the adverse party the court would set it aside as against the weight of the evidence." 6 J. Moore, Federal Practice P 56.04(2), at 2067 (2d ed. 1976).
 
 
 10
 In the case sub judice, Rosenthal was improperly deprived of a full trial on the issue of his status as a policymaker;[6] consequently, his claim that he was fired because of his political affiliations, in violation of the First Amendment, was not considered. Therefore, the judgment of the district court will be reversed as to all defendants and remanded for proceedings consistent with this opinion.
 
 
 11
 ALDISERT, Circuit Judge, dissenting.
 
 
 12
 I would affirm the judgment of the district court for two discrete reasons. First, summary judgment was the proper disposition since no dispute existed among the parties as to the actual, historical or narrative facts of this case. Second, assuming arguendo that Harold Rosenthal was fired for political reasons, the proscriptions of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), cannot operate in cases such as this, where appellant is clearly a "confidential", policymaking employee.[1]
 
 I.
 
 13
 In granting summary judgment, the district court properly treated the issue of whether Rosenthal was a "policymaking" employee as a matter of law. There existed no real dispute as to the historical or narrative facts. Rosenthal held the position of Administrative Assistant to the Director of Commercial and Industrial Relocation for the Redevelopment Authority of Philadelphia. He was hired by his stepsister Lynn Abraham, then Executive Director of the Authority, to report to her on the activities of the Commercial and Industrial Relocation Department of the Authority. Appendix at 58a, 112a. Abraham explained that she wanted somebody whom she could "trust" to tell her what was happening in that department, which, according to Abraham, was operating in an allegedly questionable fashion. Id. at 58a. Appellee Salvitti described Rosenthal's hiring as being "for one specific reason, that was to spy on the department for Lynn Abraham." Id. at 94a.
 
 A.
 
 14
 Behind such emotive linguistic tags as "someone to trust", or "a spy", there lies a consensus which belies the majority's concern that the "conflicting evidence" should have precluded summary judgment: namely, all parties agreed that Rosenthal was hired as Lynn Abraham's personal investigator. Since there was agreement on what Rosenthal actually did the "basic" facts the only remaining question was how to characterize his job. Whether it should be characterized as a policymaking position was not a remaining issue of basic fact, but an issue of ultimate fact, and therefore a matter of law for the court, and not the jury. "The ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary or circumstantial facts." Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1937). Justice Frankfurter's explanation in Watts v. Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (1949), has particular significance here:
 
 
 15
 But "issue of fact" is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication . . . (It is) important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determination of fact, are the very issues to review which this Court sits.
 
 
 16
 See also United States v. Delerme, 457 F.2d 156 (3d Cir. 1972).
 
 
 17
 The district court here did not shirk its responsibility in meeting the question of law. Nor should this court.
 
 B.
 
 18
 The Elrod plurality itself provided guidance for discerning the essential character of a job:
 
 
 19
 No clear line can be drawn between policymaking and nonpolicymaking decisions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. . . . An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals.
 
 
 20
 427 U.S. at 367-68, 96 S.Ct. at 2687. In the present case, ample information in the record supports the district court's characterization of Rosenthal's job as a policymaking one. Along with the undisputed fact that Rosenthal "act(ed) as an advisor" to Abraham, considerations supporting the district court's ultimate finding include Rosenthal's exercise of supervisory responsibilities, Appendix at 107a-08a, 119a-21a, 125a; his actions as liaison between two Authority departments, id. at 118a-19a; his recommendations regarding bid acceptances, id. at 118a; and his participation in the revision of the moving and relocation code. Id. at 55a.II.
 
 
 21
 An alternate ground for affirming the district court's judgment lies in the necessary conclusion that even if Rosenthal is not viewed as a "policymaker" within a particular judge's conception of that term, he was clearly at least a "confidential" employee. As such, his dismissal still falls within the Elrod plurality's exception, fashioned to insure "that representative government not be undercut by tactics obstructing the implementation of policies of (a) new administration, policies presumably sanctioned by the electorate." Elrod, supra, 427 U.S. at 367, 96 S.Ct. at 2687.
 
 A.
 
 22
 In Elrod, the Supreme Court addressed a claim that patronage dismissals of non-civil-service employees of the Cook County, Illinois, Sheriff's Office, were violative of the First Amendment freedoms of political belief and association. Justice Brennan, in a plurality opinion joined by Justices White and Marshall, concluded that any contribution which political patronage might make to the democratic process was not sufficient to override its encroachment on First Amendment freedoms. As support for this view of patronage, the plurality quoted from CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973): "(T)he judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." 427 U.S. at 354, 96 S.Ct. at 2680, quoting Letter Carriers, supra, 413 U.S. at 564, 93 S.Ct. 2880. This statement, however, was used by the Letter Carriers Court for a far different reason to support the constitutionality of the Hatch Act's prohibition against federal employees' taking an active part in political management or political campaigns. It is well to note a passage from Letter Carriers which appears shortly after the plurality's truncated quotation: "Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U.S. at 564, 93 S.Ct. at 2890. In effect, then, the Elrod plurality attempted to extend by case law the application and scope of a statute, the Hatch Act, regulating certain federal employees, to state or county employees not covered by the federal statute. Thus, the ratio decidendi of the Elrod plurality is somewhat tenuous.
 
 
 23
 Fortunately, five Supreme Court justices (Justices Stewart and Blackmun, concurring; Chief Justice Burger, and Justices Powell and Rehnquist, dissenting) could not ascribe to the Elrod plurality's broad renunciation of the patronage system, in Justice Stewart's formulation, a "wide-ranging opinion." 427 U.S. at 374, 96 S.Ct. 2673. Thus, in concurrence, Justice Stewart articulated the rule of the case: "(A) nonpolicymaking, nonconfidential government employee (cannot) be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at 375, 96 S.Ct. at 2690 (emphasis added).[2]B.
 
 
 24
 Harold Rosenthal was, at the very least, a "confidential" employee. He was hired by his step-sister because she had to find someone whom she "could trust implicitly." Appendix at 51a. His mission was to investigate a certain department and report directly back to Abraham on its activities. Once Abraham left the Authority, her successor understandably determined that he could not utilize appellant in the same manner.
 
 
 25
 The majority attempts to limit the thrust of the confidential employee exception by suggesting, in footnote 5, that a confidential employee would not be one "who has covert activities as part of his duties, but instead one who is privy to the discussions and information involved in the policymaking process." Yet the majority admits that the purpose of the Elrod exception is to insure that our system of government "not be undercut by tactics obstructing the implementation of policies of the new administration". Majority Opinion at 2, quoting Elrod, supra, 427 U.S. at 367, 96 S.Ct. at 2687. Rosenthal was not an integral part of the Commercial and Industrial Relocation Department; rather, he was a personal extension into that department of its administrator, Lynn Abraham. As such, he was privy to the "discussions and information involved in the policy-making process." When Abraham left the Authority, Rosenthal no longer had a role to play. His original, confidential function now defunct, he could not implement the policies of the new administration. His presence could only obstruct new policy implementation, the very danger sought to be avoided by the Elrod exception.
 
 
 26
 Accordingly, there being no role to be played by a factfinder in these proceedings, the basic facts not being disputed, it remained for the court to draw a legal conclusion from those facts. The district court did just that. It faced up to an obligation to decide a question of law. And I would affirm what it did.
 
 
 
 [1]
 We express no opinion as to Rosenthal's pendent state claims, since the district court apparently felt it unnecessary to pass upon them after the grant of summary judgment as to all federal claims
 
 
 [2]
 Rosenthal subsequently amended his complaint with respect to the First Amendment claim, but the amended complaint expressly declared that "Plaintiff realleges and incorporates by reference herein paragraphs 1-27, and 29-36 of plaintiff's original complaint." Appendix at 136a. Thus, the crucial paragraph 10 was realleged, and defendants made no attempt to withdraw the admission in their answer
 
 
 [3]
 The district court may have believed that Rosenthal's status as a policymaker vel non was a question of law, for in addressing the First Amendment claim, the court indicated that there were no facts in dispute: "Since there is no substantial dispute as to the facts there remains solely the question of whether plaintiff's employment was a 'policy-making' position." Appendix at 139a-140a. The court's approach to the issues, however, belies such an interpretation:
 Based upon our review of the affidavits and deposition transcripts we find that plaintiff was employed in a policy-making position by the R.D.A. His duties included the investigation and supervision of the bidding procedures for moving contracts and thereby he made, at the minimum, an indirect contribution to the formulation of R.D.A. policy. As a result of this finding, we have concluded that as a matter of law plaintiff cannot successfully challenge the termination of his employment on the basis of infringement of his First Amendment rights.
 Appendix at 140a (emphasis added). Thus, the district court apparently was aware that it was making a finding of fact based upon its weighing of the evidence.
 
 
 [4]
 10 C. Wright & A. Miller, Federal Practice & Procedure § 2712, at 378-82 (1973) (footnotes omitted)
 
 
 [5]
 Examination of the Elrod plurality's criteria for determinations of policy-making status reveals how difficult the job of weighing evidence on that issue can be and, consequently, how inappropriate it is on a Rule 56 motion:
 No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." Illinois State Employees Union v. Lewis, supra, at 574. Since, as we have noted, it is the Government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the (state) on remand, cases of doubt being resolved in favor of the particular (employee).
 427 U.S. at 367-368, 96 S.Ct. at 2687. Thus, the determination of status as a policymaker vel non presents a difficult factual question. Where there is evidence to support the employee's claim that he does not make policy, as there is here, he is entitled to a full trial on the issue. Indeed, the state bears the burden of persuasion on that question at trial. Certainly, then, it was improper for the district court to weigh the evidence and rule against Rosenthal on this issue on a Rule 56 motion.
 It is true that Mr. Justice Stewart's concurrence in Elrod refers to a "nonpolicy making, nonconfidential government employee". 427 U.S. at 375, 96 S.Ct. at 2690. In our view the additional adjective nonconfidential does not change the basic thrust the plurality opinion, which is directed at policy formulation and representative government. A "confidential government employee" in this sense would not necessarily be one as Rosenthal may have been who has covert activities as part of his duties, but instead one who is privy to the discussions and information involved in the policymaking process. Rosenthal held a job with a specific title and certain responsibilities. The fact that he may have engaged in covert activities in addition to discharging other, everyday duties ought not, as the dissent insists, to be dispositive of his claim to retain the basic job.
 
 
 [6]
 We need not, and do not, address the district court's power to permit amendment of the pleadings i. e., the admission of Rosenthal's non-policymaking status by Salvitti and the Authority on remand
 
 
 [1]
 I am troubled by the lack of support in the discovery materials and affidavits for the allegation that Rosenthal was fired for his political associations, a necessary starting point for the majority's analysis. Plaintiff's initial complaint did not allege that he lost his job for political reasons. There is no indication in the record that Rosenthal was ever asked to change his party registration or that he was pressured to support a particular political party in order to retain his job. On the other hand, there is evidence that appellee Salvitti fired Rosenthal because Rosenthal was "unqualified" for the job. Appendix at 94a-95a. This situation is factually distinct from Elrod, supra, in which the appellants were fired because of their lack of affiliation with the Democratic party
 The district court, however, granted leave for Rosenthal to file an amended complaint substantiating his claim of abridgement of First Amendment rights of freedom of speech and association. The amended complaint, on its face, elevated this case to a level far exceeding the quality of the proofs offered. Nevertheless, even assuming arguendo that politics played a part in Rosenthal's dismissal, for reasons discussed hereinafter he cannot prevail.
 Nor do I attach critical importance to defense counsel's failure to contest the allegation in the tenth paragraph of the original complaint that plaintiff was in a non-policymaking position. First, as heretofore observed, plaintiff's initial complaint did not allege that he lost his job for political reasons. Second, what was ultimately before the district court, and what is presently before this court for adjudication, is not the original complaint, but an amended complaint. At the time the amended complaint was filed, the legal issue had been joined, and the parties, both sides, met it on the strength of the depositions, not pleadings. Although I am reluctant to resort to Mechanical Jurisprudence, for it is established that the purpose of the Federal Rules of Civil Procedure was to avoid fact pleading formularies, if I did I would conclude (a) the original answer to the original complaint has minimal jurisprudential significance, because the original complaint was superseded by an amended one, (b) no answer was filed to the amended complaint and therefore no admissions can be drawn from any answer, and (c) as hereinafter developed, I perceive the question of "policy maker" to be one of law, and not of fact, and therefore not subject to any rules relating to admitting facts in pleadings.
 
 
 [2]
 Were I writing on a cleaner slate, I would not even embrace the limitations imposed by the concurrence. Neither the plurality nor the concurrence supplied sufficient rebuttal to Justice Powell's claim, in dissent, that patronage and the material incentives it provides stimulate "political activity and by strengthening parties, thereby (help) to make government accountable." 427 U.S. at 382, 96 S.Ct. at 2694. The plurality's assertion that the abolition of patronage dismissals will not "bring about the demise of party politics" is simply not responsive to the question of accountability in government
 Acknowledging that abuses may inhere in the patronage system, I nevertheless am not prepared to conclude that there has been a corresponding increase in the quality of city, county, state and federal services since the wholesale granting of permanent tenure to government employees, by civil service legislation, and now by judicial fiat, began. My own experience is that municipal streets seem dirtier; police protection less efficient; highway maintenance virtually non-existent (in my own state of Pennsylvania); postal service a national disgrace; metropolitan garbage collection a matter of grace, not right; refuse collection a matter of private contract; and a constantly increasing headless federal civil service bureaucracy approaching the cruel, impersonal inefficiency of that of the French. Accountability to elected officials, and thus to the public, seems to be an historical concept only.
 Edward N. Costikyan suggests:
 (A)ll the histories of the political machines and their workings have been written from a reform orientation. It should be observed, however, in the absence of fairer contemporaneous data, that the political machines built the cities, paved their streets, dug their sewers, and piped their water supply systems. Furthermore, under the administration of the machines, mass transit systems, school systems, and massive developments of new housing were constructed.
 It would be laughable to suggest that any of our present city administrations could accomplish one-tenth of what the political machines accomplished during the period from the Civil War to World War I.
 The reform answer to the machine as the personnel pool for government was the creation of a competing source of manpower: civil service. As long as civil service and the machine remained in competition for the staffing of the government, the administrative result was good. But with the collapse of the machine, civil service has monopolized the field, and the administrative results have been disastrous, for the bureaucracies have a double layer of protection that deprives any elected official of the power to get the bureaucrats to do their jobs. One layer is the impossibility of firing a civil servant. The other is the civil service unions, which have such power over the city in the absence of alternative sources of manpower that in the final analysis the bureaucracies are in a position to dictate to elected officials and their appointees. The bureaucrats can specify what they will and will not do (such as inspect boilers during a cold wave), what they will wear, and where they will work. The elected official (or his appointee) is at their mercy.
 Our cities will survive and be governable only if those we elect have effective power over those who are supposed to do the work, (and) only if those we elect are responsible and accountable to the people who elect them. . . .
 Costikyan, "Cities Can Work", Saturday Review, April 4, 1970, 19, 20, 39.