629 F.2d 870
 23 Fair Empl.Prac.Cas. 843,
23 Empl. Prac. Dec. P 31,163
MAZUS, Carolyn, Appellant,
v.
DEPT. OF TRANSPORTATION, COM. OF PA.; Shapp, Milton J.;
Sherlock, William; Coddington, Leonard D.; Begler, H.;
Gastmeyer, Ernest, and Kassab, Jacob G.; Thornburgh,
Richard, Gov. of Pa.; Larson, Thomas D., Sec. of Trans.;
Governor's Personnel Secretary (Name Unknown).
 No. 79-2229.
 United States Court of Appeals,
Third Circuit.
 Argued March 25, 1980.
Decided July 28, 1980.
As Amended Oct. 2, 1980.
 
 Peter B. Broida (argued), Passman, Price & Broida, Washington, D. C., for appellant.
 Frank A. Fisher, Jr., Asst. Atty. Gen. (argued), Robert W. Cunliffe, Deputy Atty. Gen., Edward G. Biester, Jr., Atty. Gen., Dept. of Transportation, Commonwealth of Pennsylvania, Harrisburg, Pa., for appellees.
 Before ROSENN, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 In this appeal Carolyn Mazus claims she was a victim of sex discrimination and that her first amendment rights were violated when the Pennsylvania Department of Transportation (PennDOT or Department) delayed in offering her a position as a highway maintenance worker. We agree with the district court and hold that Mazus sustained no violation to her rights.
 
 I.
 
 2
 During part of and prior to 1974, the hiring of non-Civil Service Employees by PennDOT, whether male or female, was done under Pennsylvania's time-hallowed "patronage" system and not controlled by the Department. In Pike County the system operated as follows: PennDOT's personnel officer in Harrisburg advised the Governor's personnel representative of a vacancy after learning about it from a county office. The Governor's personnel representative would notify the local county chairman of the Governor's political party and forward a job application. The application then would be delivered by the chairman or his designee to the selected candidate or to PennDOT's county office in Milford. The county chairman issued only one application for each vacancy. The county chairman attempted to fill the job with a person residing in the township where the position was vacant.
 
 
 3
 From 1971 until the present, PennDOT has been operating under severe budgetary limitations. When a person with a field position left the Department that position was abolished. Thus, PennDOT's total complement had been reduced from 22,000 in 1971 to 17,000 in November of 1977. From 1971 to November of 1977, only 22 people were hired for Highway Maintenance Worker positions in Pike County.
 
 
 4
 In July 1974, the Secretary of Transportation informed Pike County Chairman Ernest Gastmeyer that some highway maintenance men would be hired in the coming fall of that year. Because of the scarcity of highway job openings since 1971, Gastmeyer had decided who would receive them and where they might be assigned.
 
 
 5
 In October 1974, PennDOT voluntarily initiated an affirmative action program which is the genesis of this proceeding. Appellant's husband, Daniel, a Department employee working in Pike County, received with his paycheck a flyer promoting affirmative action by encouraging employees to suggest to minority and female acquaintances that they apply for PennDOT jobs. Mrs. Mazus, unemployed at the time, asked her husband to obtain an application from the County Superintendent, Leonard Coddington. Mr. Mazus asked Coddington in November 1974 for such an application but Coddington was unable to obtain one. Mrs. Mazus decided to seek an application directly by the procedures suggested in the flyer. She made several trips to the PennDOT county and district offices but was always turned down. She was ridiculed by PennDOT managers at these offices who on a personal basis seemed to feel it was beneath the dignity of a woman to labor on the roads. The district court, however, found that these managers had no hiring authority.
 
 
 6
 On November 20, 1974 Mrs. Mazus communicated directly with Gastmeyer, the Pike County Democratic Chairman, who told her there were no openings for road workers. Because Mrs. Mazus wished to place an application on file should openings develop, she arranged to meet Gastmeyer at his home at 5:00 P.M. that day. When Mrs. Mazus arrived, Gastmeyer was not there. Mazus never contacted Gastmeyer again.
 
 
 7
 In late November and December 1974, PennDOT hired nine men as Highway Maintenance Workers. The district court found that all of these men had been seeking a position with the Department for some time prior to Mrs. Mazus.
 
 
 8
 On November 29, 1974, Mrs. Mazus filed a charge with the EEOC alleging that PennDOT engaged in sex discrimination in failing to hire her. On April 2, 1975, Mazus obtained an application from the Governor's Personnel Office, through the assistance of John Harhigh, the Department's Personnel Coordinator. Harhigh told Coddington that the failure to consider a female applicant was contrary to Departmental policy and informed him that Mrs. Mazus should be hired for the next job that became available. Accordingly, PennDOT hired Mazus and she started working as a highway maintenance worker in May 1977. Meanwhile, on November 7, 1975, EEOC issued its determination that there was reasonable cause to believe that Mrs. Mazus was denied the opportunity during 1974 to apply for a highway maintenance job on the basis of her sex and reasonable cause to believe that PennDOT discriminates against women as a class in hiring.
 
 
 9
 Mrs. Mazus brought suit in the district court under 42 U.S.C. § 1983 and Title VII of the 1964 Civil Rights Act, for compensatory and punitive damages as well as injunctive relief alleging that the Department's patronage hiring system was unconstitutional and that she was the victim of PennDOT's discriminatory hiring practices. She sought class certification for her claims. After trial, Chief Judge Nealon held that because Mrs. Mazus was not denied political rights, the hiring system was not unconstitutional. Mazus' motion for class certification was denied.
 
 
 10
 To prove a prima facie case of sex discrimination, Mazus introduced federal census data of the classification "laborers except farm" which showed women comprising 7.6 percent of that category. PennDOT employed only six women as laborers or only 0.17 percent. The Department, however, introduced evidence of statistics from the Pennsylvania Bureau of Employment which showed that women comprise only .51 percent of the available personnel in the relevant category. Judge Nealon concluded that the census statistics and other evidence did not establish a prima facie case of sex discrimination. In the alternative, Judge Nealon found that even if a prima facie case been made out, it had been sufficiently rebutted by PennDOT's evidence that the jobs were assigned to persons who had applied prior to the plaintiff. Mrs. Mazus appeals.
 
 II.
 
 11
 Appellant's first contention is that PennDOT's hiring system was an unconstitutional patronage system under Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In Elrod, the Court considered whether employees who allege that they were discharged or threatened with discharge solely because of their political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the first and fourteenth amendments. The plaintiffs claimed they were discharged or threatened with discharge solely for the reason they were not affiliated with or sponsored by the Cook County Democratic Party. In a plurality opinion, the Court concluded that the allegations of patronage terminations, if true, impermissibly constrained an individual's ability to act according to his beliefs and associate with others and therefore violated the first amendment.[1]
 
 
 12
 The Supreme Court has not considered whether Elrod applies to patronage hirings as well as firings. In Rosenthal v. Rizzo, 555 F.2d 390 (3d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977), this court considered the constitutionality of a political discharge of a Philadelphia employee. In dicta, the court stated:
 
 
 13
 In general, a state may not condition hiring or discharge of an employee in a way which infringes his right of political association. E. g., Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Elrod v. Burns, 427 U.S. 347, (9)6 S.Ct. 2673, 49 L.Ed.2d 547 (1976).
 
 
 14
 Id. at 392.
 
 
 15
 Mrs. Mazus argues that Rosenthal creates a cause of action in this circuit for patronage hirings. Although the language of Rosenthal clearly covers patronage hirings it is pure dicta and not binding on this court. We do not believe it is necessary in this case to determine whether such a cause of action exists[2] because, assuming arguendo a cause of action for patronage hiring, Mazus failed to prove sufficient facts. The key to Elrod and its progeny is the interference with political rights and political association. The district court concluded "that plaintiff's failure to obtain an application and appointment as a highway maintenance worker was (not) conditioned in any way which infringed her right of political association." The only proof offered by Mazus was that she had to see the county chairman to pick up a job application. She went to see the chairman once and missed him. There is no evidence as to what political views or affiliations Mazus addresses. There is no evidence that any of Mazus' activities were chilled in any manner. There is no evidence that the county chairman required a pledge of allegiance or support to any political party from Mazus or that he considered her political affiliation in acting on her application. Finally, there is no evidence that the jobs went to only members of one political party. In sum, there is no first amendment violation because there is no evidence that the job was conditioned on the surrender of any political rights or the right of political association.
 
 III.
 
 16
 Mazus' second contention is that the district court erred in concluding she failed to make out a prima facie case of sex discrimination. In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Court said that a Title VII plaintiff could demonstrate a prima facie case of discrimination by showing:
 
 
 17
 (i) that he belongs to a (group protected by the statute); (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 18
 The district court concluded that (iv) above was not present because Mazus was not denied a position that was available to others. The court found as a fact that the only people hired after Mazus applied were individuals who had been waiting much longer than Mazus for the position to become available. The court further found that after Mazus filed her application she was given the first available position. Even if a prima facie case had been made out, the court held that it had been sufficiently rebutted by PennDOT's evidence that the jobs had been assigned to persons who had applied prior to Mrs. Mazus. Mazus does not argue that under the facts found by the district court she did in fact make a prima facie showing of discrimination.[3] Rather, she claims the district court erred in failing to accept her statistical evidence as establishing a prima facie case of discrimination.
 
 
 19
 In Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), the Court stated "(w)here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." Mazus presented census data evidence to the district court. The data from 1970 census figures, entitled "laborers except farm," showed that women comprised 7.6 percent of the laborer positions in Pennsylvania. Mazus argues that the census data was sufficient to establish a prima facie case. The district court believed this category was overbroad and chose to rely more heavily on the State Bureau of Employment Security (BES) data. BES keeps records on job classifications of individuals. One classification is number "899884" which the district court found encompasses occupations including, and similar to, that of highway maintenance men. From January 1, 1975 to September 30, 1977, the number of females assigned to number 899884 varied from 0.41% to 0.68%. Code 899884 consists of
 
 
 20
 Bondactor, machine operator, chimney repairman, diver helper; then the subgroup in that field lists bellman, diver assistant, diver tender, lifeline tender, hose tender, then in highway maintenance: highway maintenance man, highway patrolman, snowplow operator, turck (sic), snowplow tractor operator, house trailer lot utility man, maintenance man house trailer, maintenance man helper, factory or mill, general maintneance (sic) helper, mobile home repairman, serviceman house trailers, pipeline, sewer pipe cleaner, electric cewer (sic) cleaning machine operator, shaft man; in the mining and quarrying industry: maintenance man, shaft mechanic, shaft repairman, shaft tender, towel cabinet repairman, and window repairman.
 
 
 21
 Joint App. 25-26 (emphasis supplied).
 
 
 22
 It appears that both the BES statistics and the "laborers except farm" categories are less than perfect. The BES statistics include certain occupations which appear less likely to draw women than a road maintenance worker. However, the census figures leave much to be desired because we agree with the district court that the category is overbroad, including many types of "inside" workers such as clerical workers, and a number of unrelated jobs. Therefore, the census figures would tend to overstate the number of women interested in employment analogous to highway maintenance work.
 
 
 23
 Statistical comparisons, if they are to have any value, must be between comparable groups and free from variables which would undermine the reasonableness of discrimination inferences to be drawn. Swint v. Pullman Standard, 539 F.2d 77, 97 n.50 (5th Cir. 1976). Such evidence must be critically examined and all facts and circumstances must be considered. Hester v. Southern Ry., 497 F.2d 1374 (5th Cir. 1974); Logan v. General Fireproofing Co., 521 F.2d 881 (4th Cir. 1971).
 
 
 24
 The district court concluded that the statistical data failed to establish a prima facie case. We do not believe this finding can be characterized as erroneous in light of the other evidence. The district court found, from the unrebutted testimony of PennDOT's Personnel Director, that few women actually sought a road maintenance position with the Department. The Pike County Superintendent for many years testified that, in his memory, Mrs. Mazus was the only woman known ever to have sought the road maintenance job. The district court also apparently found, based on all the evidence before it, that Mazus' statistical source did not accurately reflect the percentage of females interested in the work force in question and thus did not establish a prima facie case. We find no basis to reverse that decision. In any event, a finding that a prima facie case was met would not alter the outcome of the case because the district court found that even if a prima facie case had been made out, it was sufficiently rebutted by PennDOT with evidence that the jobs were assigned without regard to gender to applicants who applied before Mrs. Mazus.[4]
 
 IV.
 
 25
 Mazus' final argument is that the district court erred in failing to certify her action as a class action. Despite our resolution of the merits, two recent cases indicate that Mazus has standing to appeal the denial of class certification and that such an appeal is not moot. In United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), the plaintiff, who was challenging parole guidelines, was released from prison, making his individual claim moot. The Supreme Court concluded that he still had a sufficient "personal stake" in class certification to satisfy the case or controversy requirement of article III. The Court stated:
 
 
 26
 Although the named representative receives certain benefits from the class nature of the action, some of which are regarded as desirable and others as less so, these benefits generally are by-products of the class action device. In order to achieve the primary benefits of class suits, the Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified if the requirements of the rules are met. . . .
 
 
 27
 The imperatives of a dispute capable of judicial resolution are sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions. . . . We conclude that these elements can exist with respect to the class certification issue notwithstanding the fact that the named plaintiff's claim on the merits has expired.
 
 
 28
 Id. at 403, 100 S.Ct. at 1212 (footnotes and citations omitted).
 
 
 29
 In Alexander v. Gino's, Inc., 621 F.2d 71 (3d Cir. 1980), the court interpreted Geraghty to allow an individual to seek review of a denial of class certification even though the individual was unsuccessful on the merits.
 
 
 30
 The district court denied the motion for class certification under the following rationale:
 
 
 31
 3. Plaintiff has renewed her motion for class certification. The reasons given for denying the motion initially continue to apply: there has been no showing that the class includes anyone but plaintiff and the numerosity requirement has been satisfied. Additionally, plaintiff has not demonstrated common questions of law or fact, or that the defendants have acted or refused to act on grounds generally applicable to the class. There has been no evidence that any other person has allegedly been subjected to similar treatment except for Census Bureau statistics which are unpersuasive.
 
 
 32
 The most significant reason advanced by the district court appears to be that Mazus failed to establish a class because the numerosity requirement could not possibly be satisfied.
 
 
 33
 The district court has a good deal of discretion in determining whether or not to certify a class. Walton v. Eaton Corp., 563 F.2d 66, 74-75 (3d Cir. 1977); Jones v. Diamond, 519 F.2d 1090, 1100 (5th Cir. 1975). In this case there was no evidence that any other female ever applied for a roadworker job with PennDOT and was rejected. The statistical evidence is ambiguous at best. In sum, there was no evidence from which this court can conclude that the district court abused its discretion in failing to certify a class.
 
 V.
 
 34
 We conclude that the district court did not err in denying the relief sought by Mazus and therefore the judgment of the district court will be affirmed.
 
 
 35
 Costs taxed to the appellant.
 
 
 36
 SLOVITER, Circuit Judge, dissenting.
 
 
 37
 The district court's findings of fact show a classic case of sex discrimination which emerges when women seek to enter labor positions which were not traditionally open to them.
 
 
 38
 In November 1974, Mrs. Mazus, stimulated by a PennDOT flyer circulated to her husband and other PennDOT employees which encouraged minority and female applicants to apply for PennDOT employment at the Department's county and district offices, followed those instructions exactly. She went to the PennDOT district office at Dunmore, Pennsylvania and requested an application form for highway work. There, the District Labor Relations Officer, Bert Davis, attempted to dissuade her from seeking that type of employment. Her efforts at the county office were also unsuccessful, so she returned to the district office the following week where she met again with Davis and with Reginald Knight, an Equal Opportunity Development Specialist with PennDOT at that office. They suggested she try to find work with a private contractor. Knight added that he would not want his wife to do that type of work. Davis spoke of women who had been road workers for PennDOT, found the job too difficult, and quit. He also mentioned a woman who had attended an engineering class with him who expected her surveying equipment to be carried for her by male students.
 
 
 39
 Leonard Coddington, the Superintendent of Maintenance for PennDOT operations in Pike County, told plaintiff's husband he should try to interest her in a clerical job, that he would thereby show "what kind of man he was." Coddington also stated to the group of union committeemen, with regard to Mrs. Mazus' employment efforts, that he would not want to see his own wife in a job requiring her to work in the field with men and without proper sanitary facilities.
 
 
 40
 Mrs. Mazus did not abandon her efforts. She contacted the Pennsylvania Human Relations Commission, the state fair employment practices agency, seeking help in getting an application form, she wrote to state and federal officials for assistance in obtaining PennDOT employment or at least an application form, and she continued to call Coddington during 1974 and 1975 to inquire about job opportunities. Ultimately, Mrs. Mazus received the coveted application form through the intercession of the Governor's Personnel Office, and she was hired and started working as a Highway Maintenance Worker in May of 1977.
 
 
 41
 There is no question about Mrs. Mazus' ability to do the work. PennDOT conceded plaintiff's qualifications for a highway maintenance position which required, inter alia, (a) the ability to use simple tools in repairing potholes and minor defects in and around the state roads and (b) sufficient physical strengths and freedom from disabling defects to lift heavy objects and to work under adverse weather conditions.
 
 
 42
 The October 1974 PennDOT flyer which precipitated this series of events was purportedly sent to promote affirmative action. A review of the statistical findings of the district court demonstrates why that might have been needed. For the period 1970-1976, PennDOT employed only six women in semiskilled positions in the entire state, or 0.17% of that group of employees. For the seven counties in PennDOT District 4, which included Pike County where Mrs. Mazus lived and applied for work, PennDOT employed but one woman in the semiskilled classifications, or 0.26% of its laborer work force. In Pike County itself, women held none of the semiskilled PennDOT positions. The district court noted that PennDOT conducted an internal EEOC review for Pike County operations covering the year 1974. The review rated Pike County deficient in all categories of utilization of women and minorities.
 
 
 43
 The district court held that neither the treatment of Mrs. Mazus nor the statistical evidence sufficed to establish a prima facie case of discrimination. The court held that plaintiff failed to satisfy all of the four requirements of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), because the position she sought was not available to others. With respect to Mrs. Mazus' efforts to establish a prima facie case through the statistical evidence, the district court rejected her proffer of census data, which would have shown that women comprised 7.6% of the laborer positions in Pennsylvania, and instead used a Pennsylvania Bureau of Employment Security category in which females represented 0.41% to 0.68%. Finally, the district court held that even if Mrs. Mazus did establish a prima facie case, it was rebutted "by the evidence that the jobs were assigned to others because their interest in these positions predated plaintiff's inquiry and not because of any sex discrimination."
 
 
 44
 I dissent from the majority's affirmance of the judgment because I believe that the district court used a reason impermissible under the policy of Title VII and its precedent as the basis for its holdings that plaintiff had not established a McDonnell Douglas type prima facie case and that defendants adequately rebutted either type of prima facie case.
 
 
 45
 Title VII was enacted "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The same goal is equally applicable to sex discrimination. See Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 373, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979). A Title VII plaintiff may show either that s/he has been subject to "disparate treatment" because of race or sex, see, e. g., McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, or that s/he has been the victim of a facially neutral practice having a "disparate impact" on minorities or females. See, e. g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). A prima facie case of "disparate treatment" discrimination can be made by showing the four McDonnell Douglas factors set forth by the majority. At 874. A prima facie case of "disparate impact" can be made by showing "gross statistical disparities." Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).
 
 
 46
 Once the plaintiff has established a prima facie case, the defendant has the burden to come forward with a defense to the prima facie showing of discrimination. The principal defenses which have been recognized in the cases to date are (1) selection criteria which are job-related and thus are a business necessity; (2) business necessity; (3) a bona fide occupational qualification; and (4) a bona fide seniority or merit system. B. Schlei and P. Grossman, Employment Discrimination Law 1195-96 (1976). Both the holding that plaintiff did not establish a prima facie case of disparate treatment and the holding that defendant rebutted that case entail crediting a defense unique in Title VII cases to date, that the positions were dispensed on the basis of political patronage rather than qualifications of the applicant.
 
 
 47
 We may assume, without deciding, that if the employer had a practice of maintaining a list of applicants in the order in which they applied, and of hiring them in that order as a vacancy occurred, that would constitute a legitimate business practice. In such an instance the employer might maintain that since some jobs can be filled by employees with relatively homogeneous qualifications, it determined for reasons of fairness and public relations to hire applicants on a first-come, first-served basis rather than on an evaluation of their qualifications. In that instance, if the employer maintained a list and there were insufficient vacancies to reach down to a particular position on that list, that would constitute a satisfactory rebuttal of the inference of discrimination which arises when plaintiff establishes a prima facie case of discrimination.
 
 
 48
 However, in this case, it is undisputed that shortly after Mrs. Mazus sought to apply for the job, PennDOT hired nine men for highway maintenance positions in Pike County during November and December 1974. Therefore, there were openings after plaintiff applied and the McDonnell Douglas requirements were established. As we have noted on several occasions, we have "not been overly demanding in the proof required for a prima facie case." Jackson v. U.S. Steel Corp., 624 F.2d 436, at 440 (3d Cir. 1980), (citing Whack v. Peabody & Wind Engineering Co., 595 F.2d 190, 193 n.11 (3d Cir. 1979)). If the fact that the men subsequently hired were prior applicants has any relevance at all to this case, it would be as rebuttal in articulating a legitimate nondiscriminatory business reason for the failure to hire Mrs. Mazus. Therefore, the court erred in considering it in connection with plaintiff's prima facie case.
 
 
 49
 Insofar as it was proffered for the employer's rebuttal, there was absolutely no evidence that PennDOT, the employer, maintained any list or had a policy to award jobs in the order of application. To the contrary, PennDOT defended on the basis that it had completely abrogated its hiring responsibility in Pike County to the Democratic County Chairman, Ernest Gastmeyer. Gastmeyer controlled the job applications, and he or his political lieutenants would dispense one application for each job vacancy, thus making receipt of the application equivalent to receipt of the job. Although PennDOT did not exercise any control over hiring, its employees were inextricably interwoven with the ultimate process, since the completed application was delivered to PennDOT's County Superintendent, Coddington, who transmitted it and other necessary paperwork to the PennDOT personnel bureau in Harrisburg. That office had the authority to cancel the appointment made by the county superintendent if the employee was deemed unsuitable for the job, but there was no evidence that was done during the period at issue in this case.
 
 
 50
 The district court stated: "Mindful of the fact that there had been a job freeze since 1971, it is permissible to infer that Gastmeyer had a ready list in his 'memory bank' of potential applicants for highway maintenance positions" (emphasis added). The record is devoid of any evidence that Gastmeyer's "memory bank" listed applicants in order of their request for positions and dispensed applications in that order. I have found nothing in the record to support the majority's statement that before the jobs were awarded in November and December, 1974 "Gastmeyer had decided who would receive them and where they might be assigned." At 872. The district court merely found Gastmeyer had committed the job openings "to the various townships by October 1974," not to various applicants. Even Gastmeyer, to whom PennDOT had delegated its hiring power, did not testify that the nine men who were hired for those positions were hired because they had requested application forms before Mrs. Mazus. There was also no evidence that the jobs were awarded to the first nine men who had applied through the politicians. In fact, the findings were directly to the contrary, since the district court found: "The County Chairman would attempt to apportion job openings in the eleven townships and two boroughs in Pike County where the work would actually be performed and where it would be to political advantage " (emphasis added). Without detailing the employment process of each of the nine men, the court's findings as to one suffices to show how the process worked:
 
 
 51
 James Gifford spoke to a PennDOT foreman in late September 1974, who told him that there was a need for men and advised him to inquire at the Milford Office. There Gifford spoke with Committeeman Frank Razny, who told him to register to vote, to get six others to register, and to have his wife register or she could be in trouble. In November Gifford was told to go to Milford, where he picked up an application on November 22.
 
 
 52
 It is therefore crystal clear from this record that Mrs. Mazus was passed over in 1974, not because her request came after that of the nine men who were hired, but because she did not have the requisite political connections.
 
 
 53
 Thus the question, avoided by both the district court and the majority, is whether an employer may either defend a Title VII action or rebut a prima facie case established by the plaintiff on the basis of a practice which is unrelated to the employment needs of the employer or the qualifications of the applicant. No Title VII case to date which we have found has permitted a defense based on any reason unrelated to the legitimate business considerations of the employer.
 
 
 54
 A similar issue was considered in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where the employer required a high school education or passing of a standardized general intelligence test as a condition of employment in or transfer to jobs. In holding that the use of such employment prerequisites was impermissible on that record, the Court specifically relied on the fact that neither standard was shown to be significantly related to successful job performance. The Court stated:
 
 
 55
 On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. Both were adopted ... without meaningful study of their relationship to job-performance ability.
 
 
 56
 Id. at 431, 91 S.Ct. at 853. Later in the opinion, the Court noted that: "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." Id. at 432, 91 S.Ct. at 854 (emphasis added). The requirement that defenses must be job-related runs throughout the cases considering the validity of various employer practices. See, e. g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 425-26, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); United States v. City of Chicago, 549 F.2d 415, 428 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Vulcan Society City Fire Department, Inc. v. Civil Service Commission of New York, 490 F.2d 387, 393-94 (2d Cir. 1973).
 
 
 57
 When the courts have accepted employer defenses, they have always done so on the basis of a reason related to the employer's business. See, e. g., Jackson v. U.S. Steel Corp., 624 F.2d 436 at 439 (3d Cir. 1980) (job eliminated as a result of legitimate business reorganization); Osborne v. Cleland, 620 F.2d 195, at 197 (8th Cir. 1980) (false appointment affidavit); Chalk v. Secretary of Labor, 565 F.2d 764, 767 (D.C.Cir.1977), cert. denied, 435 U.S. 945, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (other applicants more qualified); McFadden v. Baltimore Steamship Trade Association, 483 F.2d 452, 453 (4th Cir. 1973) (pilferage by plaintiff).
 
 
 58
 Just as an employer could not defend its discriminatory hiring practices by relying on an employment agency to find its employees, see 42 U.S.C. § 2000e-2(a) & (b); EEOC Decision No. 72-268, 10 FEP 1502, 2 Empl.Prac. Guide (CCH) P 6452, p. 4200 (May 30, 1975), neither can PennDOT defend by hiding behind the arras of the political patronage system. Employment decisions based on political affiliation are themselves of questionable legality. See Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Rosenthal v. Rizzo, 555 F.2d 390 (3d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977).
 
 
 59
 The majority's affirmance of the district court's holding that an employer can rebut a prima facie Title VII case on the basis of a practice which has no relationship to its business or its legitimate business needs creates an unfortunate gap in antidiscrimination law.
 
 
 60
 Because, as noted above, plaintiff established a prima facie case of discrimination under the McDonnell Douglas criteria, it is not necessary to devote detailed consideration to the prima facie case established by the statistical evidence. It is important to note, however, that the district court's reason for rejection of the census data and its substitution of the Bureau of Employment Statistics data does not withstand analysis. The court rejected the census category "laborers except farm" entirely on the basis of the following reasoning:
 
 
 61
 Plaintiff argues further that if women were hired by PennDOT in the proportion suggested by the census, they would have held 273 labor intensive positions rather than 6. However, there is no showing that the laborers-except farm classification would be similar to highway maintenance workers. It could include a significant amount of unrelated jobs, such as defense counsel's suggestion that it includes inside workers. Mr. John Devine, Assistant District Manager for Employment Services in Pennsylvania, described the "laborers-except farm" classification as "very broad." These statistics are not demonstrably similar to the position at issue here and cannot be confidently relied on as a basis for concluding that a pattern or practice of sex discrimination exists.
 
 
 62
 The Bureau of Employment Security category, relied on by the district court, also includes inside jobs, such as maintenance man helper, factory or mill, general maintenance helper, and shaft repairman. Thus the reason given for the rejection of the census data applies equally to the data accepted. There is a more basic reason why the BES data is an unreliable indicator of the number of women in the potential work force. The BES figures record the number of applicants for unemployment compensation throughout the State. If women have traditionally been denied opportunity in the type of positions covered by that code (and a quick glance at the jobs listed in that code at 874 shows that they have been), they will have been unlikely to have applied for unemployment compensation in that category. Therefore, use of that code as the reason for rejection of plaintiff's prima facie statistical case serves to perpetuate the discrimination of which plaintiff complains. As noted in Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1976): "The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory."
 
 
 63
 On the other hand, use of census figures has been customary in employment discrimination litigation. As the Supreme Court recognized: "Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though . . . (the) work force (need not) mirror the general population." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1857 n.20, 52 L.Ed.2d 396 (1977); Dothard v. Rawlinson, 433 U.S. at 330, 97 S.Ct. at 2727; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970).
 
 
 64
 I would therefore hold that plaintiff in this case adequately established a prima facie case of discrimination under either the "disparate treatment" or "disparate impact" theory and that the basis which PennDOT used to attempt to rebut the case cannot be credited or allowed under Title VII since it has no nexus to any legitimate employment consideration of the employer. Because I believe plaintiff's statutory ground suffices to establish her claim, I need not reach the constitutional issue reached by the majority, except to note that the holding is contrary to the thrust of another case of this court, Rosenthal v. Rizzo, 555 F.2d 390, 392 (3d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977), and the policy if not the holding of the Supreme Court in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).
 
 
 
 [1]
 In Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court recently reaffirmed Elrod, holding that Rockland County Assistant Public Defenders could not be discharged solely because of their political affiliation. The Court stated that political affiliation can only be a factor in a discharge where the affiliation is an appropriate requirement for the effective performance of the office
 
 
 [2]
 In Shakman v. Democratic Organization of Cook County, 481 F.Supp. 1315 (N.D.Ill.1979), the court held that patronage hirings violated the first amendment because the hirings had the political effect of helping elect regular Democrats and defeating their opponents
 
 
 [3]
 The dissent suggests that the district court erred in failing to find a prima facie case because there was insufficient evidence to support the assertion that jobs were assigned according to the date of application. However, the district court found "that at the time plaintiff first inquired of Gastmeyer about a highway maintenance position, all had been spoken for and her gender played no part in the fact that she was not selected." Mrs. Mazus never argued that the district court's factual findings were "clearly erroneous" or that a prima facie case had been made out on her interpretation of the facts. Mrs. Mazus only argues on this appeal that a prima facie case was made out based on the statistical data. We may not engage in factfinding on this appeal and we must conclude that the finding of the district court that the jobs were assigned to individuals who had applied prior to plaintiff is not "clearly erroneous."
 
 
 [4]
 The dissent concludes that Mrs. Mazus was the victim of sex discrimination even though it asserts that the reason she was not hired was "because she did not have the requisite political connections." At 879. We believe the record fails to show either "disparate treatment" or "disparate impact" on the basis of gender and therefore we do not find a violation of Title VII